## DUNCAN v. JAUDON.

1. A person lending money to a trustee on a pledge of trust stocks, and selling the stocks for repayment of the loan, will be compelled to account for them, if he have either actual or constructive notice that the trustee was abusing his trust, and applying the money lent to his own purposes.
2. The lender will be held to have had this notice when the certificates of the stocks pledged show on their face that the stock is held in trust, and when, apparently, the loan was for a private purpose of the trustee, and this fact would have been revealed by an inquiry.
3. The duty of inquiry is imposed on a lender lending on stocks, where the certificate of them reveals a trust.
4. These principles are not affected by the fact that the stocks pledged may be such as the trustee under the instrument creating his trust had no right to invest in; as ex. gr., stock of a canal company, when he was bound to invest in State or Federal loans.
5. Notice to the cashier of a bank, or of bankers, that the stock pledged is trust stock, is notice to them.

APPEAL from a decree of the Circuit Court for the Southern District of New York.     The case was thus:

In 1833 Commodore William Bainbridge, a resident of

Philadelphia, died, leaving four daughters, one of whom was Mary T. B., subsequently the wife of Charles Jaudon. By his will he left to two trustees a considerable sum of money, directing them to invest the same in the stocks of the United States, or the stocks or funds of any individual State, and to hold the same in trust for his several daughters; one-fourth for his daughter Mary, the interest to be paid to her, "for her sole use and benefit during her natural life, and at the end of her natural life, the amount so invested to be equally divided between her children." The property left by the Commodore was invested by his trustees as the will directed, chiefly in five per cent. loans of Pennsylvania, and the interest was properly paid to the daughters. The interest received from the Pennsylvania loans, five per cent., was less than the *cestui que trusts* were content with; but the trustees appointed in the will would not depart from the directions imposed on them by it as to the class of investments in which they could invest; and becoming thus unacceptable to the *cestui que trusts*, they were discharged, in 1835, at their own request, from their trust, and surrendered the estate under their care to Samuel Jaudon, whom, on the consent of Mrs. Jaudon, the court appointed, *without security*, to be trustee, in the place of the trustees named in the will.*

The Pennsylvania five per cent. stock was now soon sold, and the proceeds invested by Samuel Jaudon in the stock of the Delaware and Raritan Canal Company, according to an arrangement previously made with the *cestui que trusts;* the new stock being one of a high character *in its class*, and which has paid for many years, with great regularity, ten per cent. a year dividend, with occasional large *extra* dividends. Mrs. M. T. B. Jaudon got thus finally 117 shares of this stock. The certificates, of which there were several, all ran thus:

"This is to certify that S. Jaudon, *trustee for Mrs. Mary T. B. Jaudon,* is entitled to seventy shares in the capital stock of the

---

* The new trustee was a brother of Charles Jaudon, the husband of Mrs. M. T. B. Jaudon.

Delaware and Raritan Canal Company. . . Transferable on the books of the Company, and on surrender of this certificate only by him or his legal representative."

This investment was made very soon after the new trustee was appointed. A similar one was made for all the sisters, and was perfectly agreeable to them all. Mrs. Jaudon considered that the trustee was "acting very judiciously, and was very glad of it."

In this state of things Samuel Jaudon, who had been dealing largely on his own account in a stock known as "Broad Top Coal and Iron Stock," a speculative stock of no established value, applied in 1865 to the National City Bank of New York to lend him money on 47 shares of this stock. They agreed to do so, and he delivered to the cashier of the bank the certificates standing in his name as trustee, executing also a power of attorney to sell in case of nonpayment of the loan; the power describing him as "*S. Jaudon, trustee for Mrs. M. T. B. Jaudon,*" and he signing himself in the same way. This dealing of Jaudon with the City Bank, based on the stock in question, and commencing in 1865, extended through a term of two years. During this time ten separate loans were made to him on the pledge of the 47 shares of the canal stock. The securities were returned to Jaudon whenever he paid up the amount of a loan, and redelivered to the bank each time a new loan was effected. In December, 1867, when the last loan matured, the bank, being unwilling to renew it, and Jaudon unable to pay it, sold the stock by the direction of Jaudon, and applied the proceeds of the sale to the payment of its debt.

A few months prior to this sale, that is to say, in July, 1867, Jaudon, wanting more money, applied to Duncan, Sherman & Co., bankers of New York, with one of which firm, William Butler Duncan, he had had ancient relations, and with whom alone he spoke in the matter, for a loan of $7000 at 90 days; telling him that he had securities to offer, and naming them,—the remaining 70 shares of the canal stock, like that pledged to the bank, declared on its face to be "in trust for Mrs. M. T. B. Jaudon." "*Upon the faith of*

*the collaterals,*" and "to oblige" Jaudon, the proposition was accepted by Mr. Duncan, who told his cashier to attend to the matter. The cashier accordingly lent Jaudon the money, taking the certificates for the 70 shares, and a power to sell like those in the other case, in which he both described and signed himself as "*trustee of Mrs. M. T. B. Jaudon.*" Jaudon failing on the maturity of the loan to pay it, the stock was sold. There was no evidence that any of the principals of the house of Duncan, Sherman & Co. had seen the certificates or powers, or had any personal knowledge of the fact that Mrs. Jaudon claimed any interest in them. But their clerk did see the certificates; and it was testified by Mr. W. B. Duncan, that "without the collaterals he certainly would not have made the loan."

Mrs. Jaudon was absolutely ignorant of all that was done, until after the stock was sold, when Samuel Jaudon disclosed the history to her.

There was no doubt that every one of these loans, whether by the City Bank or by Duncan, Sherman & Co., were to Jaudon in his personal character and for his individual use, and that the money obtained was applied to discharge liabilities incurred in the purchase or carrying of the Broad Top coal stock, in which he was at the time dealing on his own account; taking in his own name, and without the exhibition of any trust whatever, certificates for what he bought.

Jaudon being insolvent, Mrs. Jaudon now filed a bill in the court below against him, Duncan, Sherman & Co., and the National City Bank, to reach the proceeds of the property which he had disposed of. Jaudon was himself examined as a witness, and narrated with apparent general candor the history of the transaction. He stated, however, in reply to questions inviting such answers, that from his conversations with his sister-in-law (the complainant), it was his general understanding that any changes in investment which he deemed advisable would be approved by her; and that if the investment in Broad Top stock had resulted as he had anticipated, her income would have been further increased; and that in making a purchase of the stock his intention was "to

surprise her by giving her something that was worth a great deal more than all the rest." With all this he stated, however, that he had never had any conversation whatever with his sister-in-law on the subject of changing the investment made in the canal stock.

The court below decreed that Duncan, Sherman & Co. should account for the value of the 70 shares pledged to them and sold, with the dividends and other proceeds that would have been received thereon, including interest on the dividends had they not been diverted from the trust. And that the bank should do the same by the 47 shares pledged to them and sold.

Both Duncan, Sherman & Co. and the City Bank appealed.

*Mr. W. W. McFarland, for Duncan, Sherman & Co.; Mr. W. H. Arnoux, for the National City Bank, appellant:*

Assuming that both of the defendants are to be charged with constructive notice that the stock in question was held subject to some trust, from the circumstance that the word trustee appeared upon the face of the certificates, a presumption impossible to make in regard to Duncan, Sherman & Co., no member of which firm ever saw the certificates—such notice cast upon the defendants no other duty than that of ascertaining whether the power to sell and buy securities, ordinarily attending the title to such securities, had been in this case lawfully withheld from the trustee by the terms of the trust.*

While in the case of executors the law implies the power to dispose of the personal assets, and a purchaser may, as a rule, assume its existence without inquiry, and while in the

---

* Ashton *v.* Atlantic Bank, 3 Allen, 217; Albert *v.* Savings Bank, 1 Maryland Chancery Decisions, 408; Atkinson *v.* Atkinson, 8 Allen, 15; Pennsylvania Life Insurance Co. *v.* Austin, 42 Pennsylvania State, 257; Garrard *v.* Pittsburg and Connellsville, &c., Co., 29 Id. 154; Dodson *v.* Simpson, 2 Randolph, 294; Tillinghast *v.* Champlin, 4 Rhode Island, 173, 213; Field *v.* Schieffelin, 7 Johnson's Chancery, 160; McLeod *v.* Drummond, 14 Vesey, 353.

case of strict trustees, where the purchaser has notice of the existence of the trust, it may be necessary for him to ascertain that the power of sale has not been withheld by the terms of the trust; nevertheless, unless it has been withheld, and the trustee is therefore unable to sell without committing a breach of trust, the principles of law, which govern both cases, are from that point forward the same, and are so treated in all the authorities.

In cases where it is the duty of the purchaser to inquire into the trustee's power to sell, and he finds that he possesses this power, and may sell, without by the act of sale committing a breach of trust, he has the right to presume, as the law presumes, in favor of honesty and against fraud.*

There are a few cases in which the purchaser is bound to see to the application of the purchase-money. To this class the foregoing observations are of course inapplicable, but to this class the case at bar does not belong.

2. A pledge or mortgage stands upon the same footing, and is governed by the same principles as a sale, it being but a part execution of the larger power, and the exercise of which may be just as beneficial to the beneficiaries.†

3. There was no violation of the trust in question by the trustee in disposing of the canal stock. It did not even belong to any of the classes of securities in which the testator expressed a desire to have his estate invested. For aught that the defendants knew, it might have been the intention, as perhaps it was the duty of the trustee, by raising the money in question, to *reinvest* the trust funds in the class of securities contemplated by the testator. The testator's express desire in regard to the character of the investment of the trust funds, was disregarded with the consent and at the solicitation of the beneficiaries, in hopes of thus securing a larger income.

4. The evidence of Mr. Jaudon shows that it was left largely to him by this *cestui que trust,* his sister-in-law, in

---

* Broom's Legal Maxims, 911 ?

† Petrie *v.* Clark, 11 Sergeant & Rawle, 388; Miles *v.* Durnford, 2 Simons (New Series), 234; Russell *v.* Plaice, 18 Bevan, 21.

what security to invest. There had been a complete departure from the terms of the will by the investment in canal shares. The change to Broad Top stock was no greater than that was. Mr. Jaudon considered the Broad Top a promising investment, and hoped to surprise his sister-in-law by a most agreeable accession to her income. He meant to reinvest the trust moneys produced by the sale of canal shares in this new stock. This, no doubt, it was wrong in him to do; but not more wrong than what he had already done; and in one case, as in the other, he meant all for the best. But the canal stock having been sold really to make a trust reinvestment, neither Duncan, Sherman & Co., nor the bank can be made liable for the failure of the new fund; though, of course, Mr. Jaudon can be for violating the directions of his testator.

*Mr. T. R. Strong, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

It is too plain for controversy that Samuel Jaudon committed a gross breach of trust in allowing the shares of stock in the Delaware and Raritan Canal Company to be disposed of and applied in the manner they were; but as he is insolvent, and the specific property cannot be reclaimed, the inquiry arises whether the appellants, with whom the shares were pledged and for whose benefit they were sold, or the *cestui que trust*, shall bear the loss occasioned by his misconduct.

It is argued that the appellants bear a different relation to this stock from what would be the case if the investment in it had been authorized by the terms of the will. It is true the will directed investments to be made in government or State stocks, and on this account the conversion by Jaudon of the State stocks on hand into canal stock, was a wrongful act and a breach of trust. But the *cestui que trust* was at liberty to approve or reject this unauthorized proceeding, and her decision on the subject concerned no one not interested in the trust estate. She elected to approve it after she

learned of the occurrence, and by doing this adopted the new investment and waived the breach of trust. But her waiver on that occasion did not bind her to observe the same line of conduct in case of further violation of duty. It would be absurd to suppose because she ratified this transaction she intended to assent to future breaches of trust. Indeed, it is quite clear from the evidence that she acquiesced in the arrangement because her relatives who had charge of the estate advised it. In the nature of the case, she could not have had that sort of information on such a subject on which to base a correct judgment, and, therefore, necessarily relied for the security of her rights on the counsel of older and more experienced persons in whom she placed confidence. It is due to the trustee to say that the change of investment was a family arrangement, in order to obtain a greater income, and that the stock selected for this purpose was one of the best of its kind that the market afforded.

Although it is wrong in any case for trustees under a will, in making investments, to depart from the rule prescribed by the testator, yet if it is done, and acquiesced in by the party in interest, and there is no interference by the court having charge of the trust, the right of action to the *cestui que trust* for an illegal disposition of the property thus substituted is not affected by reason of this departure. It is still an estate held in trust for the beneficiary under the will, and to be protected equally with an investment made strictly in accordance with the terms of the will. It follows, then, that the relation of those having dealings with the trustee, based on shares of stock held in this way, is not changed by reason that the original purchase was not in accordance with the directions of the testator.

This brings us to a consideration of the particular transactions on which the claim for relief in these cases is founded. The dealings of Jaudon with the City Bank, based on the stock in question, commenced in 1865 and extended through a period of two years.

The dealing with Duncan, Sherman & Co. was confined to a single transaction.

The evidence leaves no room for doubt that each and all of the loans were to Jaudon in his personal character and for his individual use, and that the money obtained was applied to discharge liabilities incurred in the purchase, or carrying, of Broad Top coal stock, a speculative stock of no established reputation, in which he was at the time dealing on his own account.

It is true, when he borrowed the money he had no expectation of resorting to the trust funds to repay it, but his good intention in this respect furnishes no excuse for his conduct. It was wrong for him, under any state of circumstance, to pledge the stock in order to obtain money for his personal wants. He held a fiduciary relation to it, and yet used it as if it were his own, and bargained for the consequences which followed, although the necessity for the ultimate sale of it was not anticipated by him at the time he pledged it. If the law allowed the property of the *cestui que trust* to be treated in this manner there would be little encouragement to vest an estate in trustees for the benefit of others.

It is argued that the several transactions of Jaudon with the bank and Duncan, Sherman & Co. were really, on his part, for the purpose of reinvesting the trust funds. How can this be, when he had not a thought at the time he got the money of failure to pay it? His speculations, then, were on his own account, and, like all sanguine men who deal in stocks, he had full faith that the venture in which he was engaged would prove remunerative. The idea of reinvestment was an afterthought, occurring at the time he found himself unable to pay, and obliged, as he supposed, to part with the property of his *cestui que trust*. And even then it did not assume the shape of a settled purpose, but only an intention to offer the injured party Broad Top security, in which he was operating, for the canal stock, which he was about to appropriate to his own necessities. It is natural that a trustee who makes use of trust property to pay his own debts, without a deliberate design to defraud, should intend, at some future time, to put the party wronged by

him in as good a position as before; but can such an intention be treated as a purpose to reinvest the trust funds in the securities in which the trustee is privately speculating? If it can, personal property in the hands of trustees, be the declaration of trust ever so specific, is in a very unsafe condition. The stock was not sold because it was desirable to change the investment, but for the simple reason that it had been pledged, and it was pledged for the sole object of enabling Jaudon to obtain money to advance his personal ends. If, therefore, there had been occasion for making a reinvestment, and authority to do it, the transactions in question had no reference to any such object.

But why change the investment, when the canal stock, one of the most stable of its kind in the country, was paying on the average a semi-annual dividend of 5 per cent. If it were allowable under the will to invest in the stock of private corporations at all, few more desirable than this were accessible. Experience had shown that it was safe and yielded a large income, and no prudent trustee having once invested in it, and had his conduct approved, looking alone to the interest of his *cestui que trust*, would take the hazard of selling it and purchasing another. But there was no authority to sell it, even were it desirable to do so, or to deal with it so that a sale might become necessary. If Jaudon thought so there was no foundation for his belief, and he is compelled to admit, although his whole testimony is an effort to justify his conduct, that he never had any conversation with his *cestui que trust* on the subject of changing this stock.

It was treated by all concerned, during the long course of years in which it was held in trust, as a most desirable investment, and no thought of substituting other securities for it was ever entertained by any one, until the idea occurred to Jaudon as a means of escape from the embarrassment in which he was placed by the unlawful use he made of it. The *cestui que trust* not only never gave consent to pledge or sell it, but had no reason to suppose that the trustee would attempt anything of the kind; nor has she said or done anything, fairly interpreted, which tends even to relieve

the trustee from the legal responsibility which pertains to the administration of the trust estate.

It follows, then, that the use of the stocks by Jaudon in his transactions with the bank and Duncan, Sherman & Co. was, on his part, a flagrant breach of trust, without either justification or excuse. If so, are they blameless? They cannot be, if they had actual or constructive notice that the trustee was abusing his trust and applying the proceeds of the loans to his own use. As we have seen, the loans were for no purpose connected with the trust, but for Jaudon's own benefit, and the face of the papers given as collateral security for the debts thus incurred informed the parties dealing with him that he held the stock as trustee for Mrs. Mary T. B. Jaudon, and inquiry would have revealed the fact that the use to which the stock was put was unauthorized.

The duty of making such inquiry was imposed on these parties, for it is out of the common course of business to take corporate stock held in trust, as security for the trustee's own debt. The party taking such stock on pledge deals with it at his peril, for there is no presumption of a right to sell it, as there is in the case of an executor. In the former case the property is held for custody, in the latter for administration.

It matters not whether the stock is pledged for an antecedent debt of the trustee or for money lent him at the time. It is unlawful to use it for either purpose.

In *Lowry v. Commercial and Farmers' Bank of Maryland*,* which was a case of misappropriation of corporate stock by an executor, Chief Justice Taney held " that if a party dealing with an executor has, at the time, reasonable ground for believing that he intends to misapply the money, or is, in the very transaction, applying it to his own private use, the party so dealing is responsible to the persons injured." And the Supreme Court of Massachusetts, in a recent case,†

---

* Taney's Circuit Court Decisions, 310.

† Shaw v. Spencer and others, 100 Massachusetts, 389.

in its essential features like the case at bar, decides that if a certificate of stock, expressed in the name of "A. B. Trustee," is by him pledged to secure his own debt, the pledgee is, by the terms of the certificate, put on inquiry as to the character and limitations of the trust, and, if he accepts the pledge without inquiry, does so at his peril. In that case the *cestui que trust* was not named in the certificate, and the court remarked that, if it were so, the duty of inquiry would hardly be controverted.

If these propositions are sound, and we entertain no doubt on the point, the liability of the appellants for the conversion of the stock belonging to Mrs. Jaudon cannot be an open question. They either knew, or ought to have known, that Jaudon was operating on his own account, and are chargeable with constructive notice of everything which, upon inquiry, they could have ascertained from the *cestui que trust.*

If this inquiry had been pursued they could not have failed to discover the nature and foundation of the trust, and that the trustee had no right to pledge the stock for any purpose. The bank, in its dealings with Jaudon, was guilty of gross negligence, and, in consequence of this, inflicted serious injury upon an innocent person. It may be that the cashier never inquired of Jaudon what he wanted with the money, but nine successive loans to him in one year, each time on the pledge of the same trust security, was evidence enough to satisfy any reasonable man that the money was wanted for private uses, and not for any honest purpose connected with the administration of the trust.

Duncan, Sherman & Co., although intending no wrong, cannot escape their share of responsibility. Duncan lent the money to Jaudon to oblige him, and, in the very nature of the transaction, he did it for Jaudon's private accommodation. On making the application Jaudon told him he had securities to offer, naming them, and naturally he supposed they were Jaudon's own property. It is his misfortune that he turned them over to his cashier, with directions to accommodate Jaudon, without having personally examined them. If he had made this examination, we are persuaded

the *cestui que trust* would have had no occasion to be dissatisfied with his conduct.

It is needless to argue that Duncan is bound by the notice communicated to the cashier when he received the certificate and concluded the business with Jaudon.

Without pursuing the subject further, we are satisfied that the decrees below should be

AFFIRMED.