SAMUEL E. WILLIAMSON, Trustee under Will of M. B SCOTT, Deceased, Respondent and Appellant, *v.* THOMAS F. MASON, FRANCIS B. WALLACE, JOHN F. PHILLIPS, Appellants, and THE ATLANTIC NATIONAL BANK, Appellant and Respondent, and others, Respondents.

*National bank — powers of cashier of — when bank bound by acts of.*

The plaintiff, who held certain shares of stock as trustee, kept an account with the Atlantic National Bank. These shares he placed in the hands of the cashier of the bank, with the knowledge and approval of its president to be sold when he should direct, the proceeds to be placed to his credit. It had previously been customary for the officers of the bank to receive stocks and bonds to be sold for him in that way.

Subsequently the cashier transferred the shares to his own name, as cashier, the plaintiff consenting thereto upon his representing that it was done to facili-tate their sale. Thereafter the cashier hypothecated the shares with a broker to secure a loan made for the purposes of his own private speculation. *Held*, that the bank was liable to the plaintiff for the unauthorized and wrongful act of the cashier.

*The United States* v. *City Bank of Columbus* (21 How. [U. S.], 356) distinguished.

A purchaser with notice, except the party guilty of the primary fraud, will secure a good title to property by obtaining it from a party who had no notice.

Cross appeals from a judgment entered upon the trial of this action by the court without a jury, providing that the plaintiff recover of the defendants Thomas F. Mason, Francis B. Wallace and John F. Phillips, the sum of $64,190.65, being the value of 466 shares of the capital stock of the Lake Shore and Michigan Southern Railroad Company, and 300 shares of the Cleveland and Pittsburgh Railroad Company, besides costs and an additional allowance.

The court, in its decision, found that the plaintiff was not entitled to any judgment for damages against the Atlantic National Bank, but that such bank was a proper party to this action. The plaintiff appealed on the ground that the judgment gave no relief against The Atlantic National Bank.

The Atlantic National Bank appealed, because it was entitled to a judgment in its favor, and to costs.

The defendants Mason, Wallace and Phillips appealed from the whole and every part of said judgment.

The facts, as set out in the opinion of Van Brunt, J., at Special Term, were as follows :

On or about the 13th of February, 1873, the plaintiff was the owner of 466 shares of the capital stock of the Lake Shore and Michigan Southern Railroad Company, and also of 300 shares of the capital stock of the Cleveland and Pittsburgh Railroad Company, the certificates for which stock stood in the plaintiff's name. On or about said last-mentioned date, the plaintiff having attached blank powers of attorney to said certificates of stock, authorizing the transfer of the same to the name of F. L. Taintor, cashier (the said Taintor being then cashier of the Atlantic National Bank), deposited the said certificates and powers of attorney with the said Taintor as such cashier, with the view that said stock should thereafter be sold, and the proceeds of such sale be deposited to his credit in his account with said bank ; and at the time of such deposit informed the president and cashier of said bank of his said purpose. Afterwards, the plaintiff instructed the said cashier to sell, or cause to be sold, the said stocks at not less than certain specified prices, and to pass the proceeds of such sale to his credit. Afterwards, the said Taintor, cashier, caused all the said stocks to be transferred upon the books of said companies, respectively, into his own name, as cashier ; and, at the same time, surrendered the said certificates received from the plaintiff, and obtained new certificates to the tenor and effect that he, as cashier, was the owner of the stock mentioned in the several certificates, of which fact he notified the plaintiff, who assented thereto. Thereafter, on the 27th day of February, 1873, the said Taintor, representing that he was acting for the Atlantic National Bank, borrowed of the defendants, F. B. Wallace & Co., the sum of $50,000, and left with that firm, as

security for the loan, 450 shares of the stock of the Michigan Southern Railroad Company, 200 shares of the stock of the Cleveland and Pittsburgh Railroad Company, and some Western Union Telegraph and United States bonds. The loan remaining unpaid, Taintor, as cashier, about the nineteenth day of April, sent to Wallace & Co. 300 shares of the Cleveland and Pittsburgh Railroad Company, and sixteen shares of the Lake Shore and Michigan Southern Railroad stock, receiving in lieu thereof the 200 shares of the Cleveland and Pittsburgh stock, the Western Union Telegraph bonds, and $3,000 of United States government bonds. The said railroad stocks remaining in the hands of Wallace & Co. being those of the plaintiff hereinbefore mentioned. The rate of interest at which the loan of $50,000 was made was about two per cent per month. Wallace & Co. subsequently borrowed of Belmont & Co., and deposited with them the said stock of the plaintiff and some quicksilver mining stock, as collateral security. On or about April twenty-sixth, in consequence of the misappropriation of the funds of the bank, the Atlantic National Bank failed, and Wallace & Co. having been requested by Belmont & Co. to take up this loan of $50,000, applied to the defendant Mason to repay said loan to Belmont & Co., and take up the securities in their hands. That at time of paying said loan to Belmont & Co., the defendant Mason had no knowledge in whose name the said securities stood, and did not have such knowledge until after he had paid his money to Belmont & Co. and received said securities. That, immediately upon examining the same, his attention was called to the fact that they stood in the name of Taintor, cashier, and that they might be some of the securities belonging to the Atlantic National Bank, which Taintor was alleged to have embezzled. Subsequently, Mason gave up to Wallace & Co. their quicksilver stock, and, at their request, sold the plaintiff's stock at public auction, and B. F. Dunning became the purchaser at such sale. On the 30th of April, 1873, while said stock was in the possession of Mason, the plaintiff made a demand upon Mason and Wallace & Co. for the same, and, upon a refusal to deliver the same, commenced this action for its recovery.

*S. W. Fullerton*, for the appellants, Mason, Wallace and Phillips.

*Charles Tracy*, for the Atlantic National Bank, appellant and respondent. There was no proof connecting the bank with the misappropriation of the stock or the transactions of Taintor complained of by the plaintiff. He was not engaged in the business of the bank when performing those transactions. His authority as cashier was limited, and did not include the transferring of shares of stock. (*Watson* v. *Bennett*, 12 Barb., 196, 200; *Barrick* v. *Austin*, 21 id., 241, 242; *United States* v. *City Bank of Columbus*, 21 How. [U. S.], 356, 364, 365.) There was nothing before the court to show that Williamson had any right or authority to transfer the shares which stood in his name as trustee. A trustee cannot effectually transfer any of the stocks of his fund unless his trust deed gives him express authority so to do. (*Duncan* v. *Jaudan*, 15 Wall., 165; 8 Blatchf., 430; *Shaw* v. *Spencer*, 100 Mass., 382, 389; *Lowry* v. *Commercial Bank*, Taylor, 310; *Pollock* v. *National Bank*, 7 N. Y., 274; *Bayard* v. *Farmers and Mechanics' Bank of Philadelphia*, 52 Penn., 232.)

*Henry J. Scudder*, for the plaintiff, appellant and respondent. There is one way, and only one way, in which the defendants, Wallace & Co. and Mason, can defend themselves against the plaintiff's equity, and that is by the creation of an estoppel. To do this they must show themselves purchasers in good faith for value, without notice of the fraud of Taintor, and without notice of any facts which would have put them on inquiry. (*Weaver* v. *Barden*, 49 N. Y., 286; *McNeil* v. *The Tenth Nat. Bk.*, 46 id., 325; *Crocker* v. *Crocker*, 31 id., 507.)

DANIELS, J.:

The object of this action was to set aside and annul the hypothecation of 466 shares of the Lake Shore and Michigan Southern Railroad Company stock, and 300 shares of the Cleveland and Pittsburgh Railroad Company stock. Shares for which these had been substituted had previously been held by the plaintiff as trustee. He had kept two bank accounts with the Atlantic National Bank, which was a banking association, formed under the National banking laws of the United States. One of the accounts was with him as executor, and the other individually. He placed the shares in

the hands of the cashier of the bank, with the knowledge and approval of the president, at its banking office, for the purpose of being there held until he should direct their sale, and then to be sold, and the proceeds credited on his account. According to his own evidence, which upon this subject was in no way contradicted, it had been previously customary for the officers of the bank to receive bonds and stock for him, and after selling them, to pass the proceeds to his credit. After these stocks had been placed in the custody of the cashier, as an officer of the bank, he caused them to be transferred into his own name, for the convenience of selling them, as he represented that act to the plaintiff. And the latter upon that assurance assented to the transfer. Soon afterwards, and on the 27th day of February, 1873, Taintor, the cashier of the bank, borrowed through the defendants Francis B. Wallace and John F. Phillips, who carried on business as brokers, under the name of F. B. Wallace & Co., the sum of $50,000, and he delivered to them as security for the loan, the greater portion of these shares of stock. And very soon after that, by a change made of other securities, he delivered to them the residue of the stock held by him, as cashier, for the plaintiff. The loan made by the cashier, Frank S. Taintor, was really made for himself, and the stocks were hypothecated for its security, without the authority of the plaintiff or of the bank. But for this wrong of the cashier, it was held at the Special Term, the bank itself was not liable, and the complaint as to it was dismissed, but without costs. An appeal was taken from that part of the judgment by the plaintiff, for the reason that the bank was deemed liable for this act of its cashier; and by the bank, because costs should have been adjudged in its favor.

The determination, so far as it was in favor of the bank, appears to have proceeded upon the authority of the case of *The United States* v. *City Bank of Columbus* (21 How., U. S., 356), in which the duties of the cashier of a bank were defined. But the decision upon the case then presented by the facts was not decisive of the one now before the Court. It arose upon a contract for the transfer of $100,000 of the public moneys from New York to New Orleans. And it was held that the cashier of the bank had no authority to make the agreement. In the course of the opinion delivered it was said that the cashier of a bank was " an executive officer by whom

its debts are received and paid, and its securities taken and transferred, and that his acts, to be binding upon a bank, must be done within the ordinary course of his duties. His ordinary duties are to keep all the funds of the bank, its notes, bills and other choses in action, to be used from time to time for the ordinary and extraordinary exigencies of the bank. He usually receives, directly, or through the subordinate officers of the bank, all moneys and notes of the bank, delivers up all discounted notes and other securities when they have been paid, draws checks to withdraw the funds of the bank where they have been deposited, and as the executive officer of the bank, transacts most of its business." And a safe guide as to the authority was considered to be supplied "by an inquiry into the corporate ability which has been given," or which the directors of the company can confer upon the officers to act for them. (Id., 364, 365.)

He has been described as the " executive officer through whom and by whom the whole moneyed operations of the bank, in paying or receiving debts, or discharging or transferring securities are to be conducted." (Angell & Ames on Corp. [4th ed.], §§ 299, 300.) And it has been declared "that the officers of a bank are held out to the public as having authority to act according to the general usage, practice and course of business of such institutions, and that their acts within the scope of such usage, practice and course of business, bind the bank in favor of third persons, having no knowledge to the contrary." (Story on Agency [4th ed.], § 114.) And within the operation of this general principle, it has been held that a bank will become liable for the misconduct of a notary, selected by its officers to charge parties to negotiable paper transmitted to it for collection. (*Walker* v. *Bank of N. Y.*, 5 Seld., 582.) Its obligations in that respect extending beyond the mere employment of a competent person, and including a liability for negligence and unskillfulness in the performance of his official acts. (*Ayrault* v. *Pacific Bank*, 47 N. Y., 570 ; 2 Hilliard on Torts, 480, § 9.) The duties to be performed in cases of that description closely resemble those which were required in the sale of the plaintiff's stocks. In each the intervention of a subordinate was necessary, and the end to be secured was identical, that of placing the proceeds to the credit of a customer of the bank. An authority broad enough for

one would seem to be equal to the creation of the obligation required to sustain the liability of the bank for the other.

The national banking law, too, appears to have been framed upon the theory that the institutions formed and existing under it could lawfully exercise the authority necessary for the sale of these stocks. The abstract power of making such sales, it is true, was not conferred upon them. But, it was provided that they might exercise " all such incidental powers as shall be necessary to carry on the business of banking by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security; by obtaining, issuing and circulating notes according to the provisions of this act." (Vol. 13 [U. S.], Stat. at Large, 101, § 8.) The authority, in terms given, was all that might be incidental to the proper attainment of these specified objects. No discrimination was attempted. But it was intentionally left to be determined, whether the act itself could properly be held to be an incident of the object designed to be secured. And when that should prove to be the fact, it was within the power described, as being conferred. The ultimate object for which the certificates of stock were delivered by the plaintiff in this instance was the increase of his deposit account with the bank. The holding and sale of the shares were simply to contribute to the promotion of that result. They were incidents for the purpose of obtaining that end. And for that reason it was a part of the business of banking, as this institution was allowed to carry it on.

A more extended authority even than that was held to be possessed by national banking institutions in the case of *Leuven* v. *National Bank of Kingston* (54 N. Y., 671). That case was not fully reported, but it was stated " That the business of exchanging government securities was such as a national bank, through its officers, could properly and legally engage in, was held in the prevailing opinion, and was concurred in by all." (Id., 672.) There surely was nothing so peculiar about such a transaction as would allow it to be a proper one if that contemplated in this instance would be improper. The power to exchange, by its agency, securities issued by the government would also include the exchange of a distant customer's stocks for money for the purpose of increasing his deposits.

The bank was undeniably empowered to receive and hold such deposits, and it was allowed to obtain them by the exercise of mere incidental authority appropriate to that end. And the sale which was to be made involved nothing beyond what could be properly performed for that purpose.

By the change in the form of the certificates from the name of the plaintiff as trustee, to that of Taintor as cashier, upon their face they became the apparent property of the bank itself. The fact that the new certificates were issued to him as a cashier was sufficient to invest them with that character. (*Bank of State of New York* v. *Muskingum Bank*, 29 N. Y., 619; *Shaw* v. *Spencer*, 100 Mass., 382; *Bayard* v. *Farmers and Mechanics' Bank*, 52 Penn., 232; *Duncan* v. *Jandon*, 15 Wall., 165.) They were received by the cashier as the fiscal officer of the bank, within the line of his authority, as its agent, to be used in the exercise of a portion of its corporate functions. And the bank became obligated to the plaintiff for their devotion to the purpose intended to be accomplished by means of their delivery. Its agent misappropriated them, and for the wrong perpetuated the law rendered the principal liable to the party who had been despoiled. The liability is a common one, including not only individual employes, but also those of a corporate character whose officers and agents betray the trusts committed to their charge. (*Cosgrove* v. *Ogden*, 49 N. Y., 255; *Philadelphia and Baltimore Railway Co.* v. *Quigley*, 21 How. [U. S.], 202; *Weed* v. *Panama R. R. Co.*, 17 N. Y., 362; *Bruff* v. *Mali*, 36 id., 200; *New Haven R. R. Co.* v. *Schuyler*, 34 id., 30; *Blackstock* v. *N. Y. and Erie R. R. Co.*, 20 N. Y., 48.) Whether the bank may be liable as for a wrongful conversion, by its cashier, of the plaintiff's property, or for the non-performance of its agreement to hold and sell the certificates of stock and place the proceeds to his credit on its books, or the failure to fulfill the purposes of the trust for which the certificates were received and held by it, is not now material to be decided. It is sufficient for the present purposes that it did become liable for the misappropriation of the property. The peculiar manner in which the injury should be redressed will, more appropriately form the subject of consideration whenever another trial of this portion of the action shall take place.

The certificates which were disposed of were not negotiable

instruments, and for that reason the defendants could only acquire title to them by purchasing them, relying on the fact that they were the property of the bank. (*Mechanics' Bank* v. *N. Y. and New Haven R. R. Co.*, 3 Kern., 600; *Weaver* v. *Barden*, 49 N. Y., 286.) That they had that appearance is manifest from the fact that they stood in Taintor's name, as its cashier. And if they had been purchased or received from him in good faith, by Wallace & Co., for value advanced upon them, their title would have been complete against the plaintiff. (*Moore* v. *Metropolitan Bank*, 55 N. Y., 41.) But it was held at Special Term that they failed to secure such a title to the certificates of stock in controversy, because they received them under circumstances so suspicious in their nature as to render it their duty to inquire, before they advanced money upon them, whether he was truly acting for the bank, whose officer he was, or for himself, in violation of his duties in that capacity.

If they did receive them in that way then the result deduced legally followed. For Wallace & Co. could not become *bòna fide* holders of the certificates under circumstances involving such a degree of suspicion, as charged them with the duty of making inquiries which they wholly neglected. (*Williamson* v. *Brown*, 15 N. Y., 354.)

The point presented, therefore, by their appeal is rather one of fact than of law; and it involves an examination into the evidence for the purpose of determining its sufficiency to sustain the conclusion which has been deduced from it by the learned judge before whom it was given by the witnesses. That which was chiefly important upon this subject was given by Taintor and Wallace, who were the persons immediately concerned in the loan of the money and the transfer of the certificates. The latter testified positively to his own good faith in the transaction. But under the circumstances disclosed his evidence was not entitled to be regarded as controlling upon the action of the court, and it was so considered in the decision of the case. His description of the transaction was not unqualifiedly accepted, and this court is not able to say that any error intervened in adopting that view of the case; for it was at variance with the relation given by Taintor, and with certain cogent facts and circumstances appearing and remaining uncontradicted by the defendants; and it might very well have been found from the

evidence of Taintor, that he applied for and received the loans made upon the security of the certificates for himself individually. But as he was directly contradicted as to this fact by Wallace, it was not improperly held that the loan was applied for in the name of the bank. As to the terms of the loan and the concomitant circumstances no such conflict was presented. It appeared to be what is known as a loan upon call, for no specified period of time. And it was made upon the agreement that interest should be paid upon it at the rate of seven per cent and such additional sum as Wallace & Co. should be compelled to pay for the use of the money, which afterward proved to be about two per cent a month. The bank seems to have been in good credit and no special cause beyond the alleged stringency of the money market was assigned as a reason why it should be willing to consent to the imposition of terms so onerous in their nature. And the force of that was materially diminished by the fact which was shown that a bank borrowing money in that manner, could not ordinarily fail to involve its standing and credit in suspicion by the act.

It also appeared that the cashier had been buying and carrying stocks on margin through the firm of Wallace & Co. as his brokers for several years before, and including the period of this transaction. At the time of it they were carrying Pacific mail stock for him, the price of which was rapidly falling in the market. This decline from the 21st of February, 1873, and, within a short time, extended from seventy-two and seventy per cent down to forty-nine. And on the morning of the day when they made their loan to him he paid them the sum of $10,000 to keep up his margin. From this course of dealing between them and the losses which the decline in prices was entailing upon him, they certainly had reason to believe that Taintor required the money he was willing to submit to severe terms to obtain, to meet his own losses, and not, as he represented, for the convenience of the business of the bank. They certainly must have suspected, what would ordinarily be supposed and has so often proved to be the truth, that the pressure of his straitened circumstances was inducing him to misappropriate what, on its face, appeared to be the property of the bank, in order to relieve the necessities of his situation. The fact is not to be overlooked or divested of its

importance that they were experienced operators, and probably familiar with the fate of others whose losses in the stock market had so frequently induced them to hazard the commission of crime by the embezzlement of funds and property committed to their charge, in order to avert what appeared to be impending financial disasters. The operations of the cashier were becoming ominous, and as Wallace & Co. were conversant with the situation of his affairs they had good reason to believe that he was seeking his own relief, and not that of the bank in whose name he professed to act. This was a subterfuge merely, and as experienced and intelligent dealers it must have been transparently so to them.

After that Taintor made other large payments to them for the purpose of protecting his declining property, and on the 1st of April, 1873, loaned them $30,000, money of the bank, at the rate of simple interest. It was stated that this was designed to be temporary merely, and for that reason chiefly it was considered desirable to allow the loan made by Wallace & Co. to remain as it was and not to be reduced by the loan of the bank as a payment. This may have been the truth, but the excuse is certainly liable to the suspicion that the transaction was given this form because it was believed that Taintor when he borrowed had procured the money for himself instead of the bank.

On the 17th of April, 1873, Wallace & Co. borrowed $50,000 from Belmont & Co. and transferred to them these same certificates of stock by way of security, and on the twenty-sixth the financial losses of Taintor reduced the bank to a state of insolvency and failure. Upon that fact becoming known Belmont & Co. applied to Wallace & Co. to replace their loan, but instead of doing so themselves they induced the defendant Mason to do it for them. And after he had done so the certificates of stock were sold and they became its purchasers. This, as well as the other circumstances appearing in the case, betrays the existence of suspicion on their part that they had acquired an infirm title to the property in controversy, and were conscious of the necessity of improving it by continuing and preserving the superior rights which Belmont & Co. had probably secured by means of their loan. Throughout, the title of Wallace & Co. was shown to be exceedingly suspicious, so much so that it very justly deprived them of the character of purchasers

of these certificates in good faith. Enough was shown to impose upon them the duty of inquiring of some other officer than the defaulting cashier, whether the money applied for by him was really desired to meet the exigencies of the bank, and that at once would have led to the discovery of the fraud he was attempting to commit.

Evidence was given on the part of the plaintiff, by bank officers, showing that loans of the description of that procured from Wallace & Co. were not usually made to banking institutions, and that, if made on such terms, the knowledge of them would involve the banking corporation making them in discredit and distrust. This was very apparent without evidence, and strictly the evidence which was given to prove it could have been much better excluded. But as it related to a matter of fact that would have been about equally as obvious without it, and no conclusion of the learned judge was in any form based upon any objectionable part of it, the judgment should not be reversed because it was received, even if it could be held to be improper. It is not clear that it was so, but as it evidently did no harm, another trial of the action cannot be required to rectify the error if it could be held to present one.

There was nothing whatever in the case to impeach the title of Belmont & Co. They received the certificates and advanced their money for them to Wallace & Co. without any thing casting suspicion upon the validity of the title they acquired. It is true that the certificates still remained in the name of Taintor, as cashier, but no reason was shown which would have induced the belief, on the part of Belmont & Co., that they had not been so acquired through the intervention of an entirely regular transaction with the bank. The appearances were all that way, and as Belmont & Co. acted upon them in good faith in advancing their money, their title was unimpeachable; and continued to be so when the defendant Mason advanced the money to them and took up the certificates from them. His title was held bad, because he procured the certificates under circumstances claimed to be equivalent to notice to him of the bad faith of Wallace & Co. But even if that be sustained by the evidence this result will not follow from it, for a purchaser with notice is allowed to protect his title, by proof of the fact that it was acquired from others holding it *bona fide* and without notice. A purchaser with notice will secure a good title by obtaining it from a party

who had no notice, and may hold the property bought against the equities of a party otherwise entitled to be regarded as the true owner. The only exception to this rule is that which excludes the party guilty of the primary fraud. He will not be allowed to shield himself against the consequences of his own misconduct by a sale to a *bona fide* purchaser and a subsequent purchase under him. (1 Story's Eq. Jur. [12th ed.], 393, 394, §§ 409, 410.) The defendant Mason should have had judgment in his favor. As to him and the Atlantic National Bank the judgment should be reversed and a new trial ordered, with costs to abide the event. But that will not also render another trial of the action as to the defendants Wallace and Phillips necessary, for the court, upon an appeal from the judgment, may affirm or reverse it in part, and as to all or any of the parties, and may, when proper, order a new trial. (Code, § 330.) Should the facts, however, which do not now appear, but may be otherwise shown, establish the conclusion that the judgment, so far as it is against them, should be vacated in order to attain substantial justice in the action, they may apply for that relief upon motion supported by affidavits at Special Term.

Davis, P. J., and Brady, J., concurred.

Judgment reversed, new trial ordered, costs to abide event as to defendants Mason and Atlantic National Bank; in all other respects judgment affirmed.