## FIDELITY & DEPOSIT CO. v. OKLAHOMA STATE BANK OF ENID, OKL.*

### No. 1126.

Circuit Court of Appeals, Tenth Circuit.

May 13, 1935.

Horace G. McKeever, of Enid, Okl. (Roy J. Elam, Van W. Stewart, and Harry H. McKeever, all of Enid, Okl., on the brief), for appellant.

P. C. Simons, of Enid, Okl. (C. D. Roseman and Simons, McKnight, Simons,

*Rehearing denied June 21, 1935.

Mitchell & McKnight, all of Enid, Okl., on the brief), for appellee.

Before LEWIS and PHILLIPS, Circuit Judges, and KENNEDY, District Judge.

LEWIS, Circuit Judge.

Carl R. Jordan went to Enid, Oklahoma, as the agent of Henry L. Doherty and Company in 1926, and remained there in that capacity until September 12, 1928. His business as such agent was to sell shares of stock in companies in which Doherty and Company were interested, principally Empire Gas and Fuel Company and Cities Service Company. His office was in the building occupied by defendant bank, and on the door there was the inscription "Henry L. Doherty and Company, Carl Jordan, Agent." Jordan opened an account with the bank on October 11, 1926, by depositing $440. In the month preceding he had borrowed $100 from the bank. It knew that Jordan was transacting business with the bank for Doherty and Company as its agent. He gave the bank approximately 150 checks signed as agent, his account being carried part time in his name as agent, but during most of the time in Jordan's individual name only. During the time here material, Henry L. Doherty and Company held a written agreement with appellant by which for a consideration appellant agreed to indemnify Henry L. Doherty and Company on account of losses due to defaults, if any, on the part of Jordan as its agent. It suffered such defaults to its damage, and appellant under its said obligation reimbursed Doherty and Company therefor, and then brought this suit seeking recovery against the bank by subrogation to the rights of Henry L. Doherty and Company for the amount so paid to the latter. The case was transferred to the equity side. These are the material facts:

1. On August 3, 1928, Jordan agreed to buy for W. H. Case Cities Service stock. Case on that day gave Jordan a check for $3749.50 payable to Henry L. Doherty and Company with which to make said purchase for Case. Case delivered the check to Jordan, it being for the agreed purchase price of 57 shares. Jordan by use of a rubber stamp, which he procured, endorsed the payee's name on the check, wrote his own name thereunder, took credit in defendant bank therefor, but later converted the amount thereof to his own use.

2. Riley Munkres in February, 1928, gave Jordan a certificate of deposit in The Bank of Drummond, Oklahoma, with which Jordan agreed to purchase for Munkres 27 shares Cities Service common stock. Jordan made the purchase, received a stock certificate for the shares in the name of Munkres, but never delivered the certificate to Munkres. He forged the name of Munkres on the certificate, which authorized its sale, sold the shares through defendant bank, was given credit by the bank for the proceeds of the sale, and it later permitted Jordan to withdraw such proceeds by checks and convert the same to his own use.

3. James H. Andrews and wife owned Oklahoma Gas and Electric Company stock. They delivered to Jordan certificates for said shares in February, 1928, under an agreement with him by which he was to sell those shares and purchase with the proceeds Empire Gas and Fuel Company shares. Jordan sold the Oklahoma Gas and Electric shares as agreed, and purchased in their names Empire Gas and Electric Company shares with the proceeds. He sold the latter shares through defendant bank after forging the signatures of Andrews and wife thereon, received credit for said proceeds in his account in defendant bank, and by checks against said account appropriated the proceeds for said Empire Gas and Fuel Company shares to his own use.

4. In another transaction Jordan obtained from Andrews ten additional shares in Oklahoma Gas and Electric Company under agreement to sell them for Andrews, which Jordan did, and with the proceeds purchase ten shares Empire Gas and Fuel Company stock, which Jordan did. Thereafter Jordan forged the signature of Andrews on the certificate for said shares, sold them through the defendant bank, which received the proceeds, credited said proceeds to Jordan's account, and Jordan converted the same to his own use by checks on his account in said bank.

5. John Bangerter had shares of stock in the Oklahoma Gas and Electric Company. In March, 1928, he delivered them to Jordan under agreement to sell them and with the proceeds buy Empire Gas and Fuel Company shares for Bangerter. Jordan sold the Oklahoma Gas and Electric shares and purchased the Empire Gas and Fuel Company shares for Bangerter. Later he forged the name of Bangerter on the certificate for the Empire Gas and Fuel Company shares, sold them through defendant

bank which gave him credit for the proceeds and checked them out to his own use.

Jordan, in September, 1928, voluntarily confessed his criminal conduct in all these transactions, and was sentenced to the penitentiary, and the proof herein is ample to sustain his defalcations. Doherty and Company made the parties above named whole by carrying out the contracts Jordan had made with them, and, as already said, it was reimbursed by appellant. The court below found the defendant bank not liable. The bank's cashier at Jordan's request without making any investigation except to take the word of Jordan certified that the forged signatures of Munkres, Andrews and wife, and Bangerter on their stock certificates were their true signatures. These transactions all occurred in the latter part of Jordan's term of service at Enid. In each of them he had received the full amount of the purchase money for the Cities Service and Empire Gas and Fuel Company stock, which he purchased for the parties named, but in each case when he sent in the order for the stock he remitted only $5 per share, which was permissible under his employment by Doherty and Company, in which case the remainder of price for the stock was to be forthcoming when the certificates for shares should be delivered. In remitting the stock certificates to defendant bank a draft on Jordan was attached for the amount of the remaining purchase price. When the bank notified Jordan of the drafts he did not have sufficient funds to take them up. He thereupon borrowed on his notes to the bank sufficient for that purpose, and left with it the certificates for shares as collateral security. The certificates remained with the bank until it demanded payment of Jordan's notes, whereupon the bank, with Jordan's direction or consent, would sell them and credit Jordan with proceeds so he could pay the notes, which he did by checks on the bank, except he did take the Munkres certificate for shares out of the bank, brought it back as collateral to his note, and the shares were sold by the bank to pay his note.

The cashier of the bank testified: That in various instances there would be a bunch of drafts coming into the bank and it would be bad weather and Jordan could not go out in the country to deliver the drafts to his customers. The due date would be upon the drafts and he would have to remit to Doherty and Company for them, and Jordan would put the securities up and borrow enough money to pay the drafts; that Jordan had dozens of loans against which he would put up stock as collateral security for two or three times as much as the loan on them. There was one time they had Cities Service bonds, another time government bonds, and all kinds of stock as security; that if Jordan was unable to take the stock to the customer and deliver it, he would put it up as collateral security for the loan with other securities, borrow enough money to pay the Doherty draft off, leave it on the loan until he could deliver it to the customer and pay the note off; that was the transaction from start to finish. We did know, of course, that the stock belonged to the customer, and would allow Jordan to put it up as collateral to his notes; we had no knowledge that Jordan was running behind, and except for the times that the proceeds were applied direct to the notes we had no knowledge of what Jordan was doing with the money; we knew Jordan was checking against the account for everything he needed, including his personal wants. When these drafts came to the bank he knew that Doherty's stock came with them. Jordan would open up the envelopes, and that was what they contained; that his certification to the forged signatures on the certificates was made because Jordan said the signatures were genuine; he did this "dozens of times"; that in making loans to Jordan the bank relied solely on the stock put up as collateral; that the notes Jordan gave the bank were for the purpose of procuring funds to pay Henry L. Doherty and Company for the stock, and that no loans were ever made for any purpose except to pay drafts to Henry L. Doherty and Company. He knew of no property that Jordan owned except a home in Enid on which he was paying on the installment plan.

Jordan was a witness at the trial. He testified that the W. H. Case check for $3749.59 given on August 3, 1928, was deposited in defendant's bank to his account as agent. The deposit ticket made out by him at the time the deposit was made on August 8, 1928, shows this: "Deposited by Carl R. Jordan, Agt." He further testified that he owed the bank at that time, and the amount of the Case check was checked out by him for various personal purposes and requirements, and that none of it went to Henry L. Doherty and Company. It was given to him for the purpose of buying Cities Service stock for Mr.

Case. He failed to make any purchase of that kind for Mr. Case. Previous to that time he had changed his account from "Carl R. Jordan" to "Carl R. Jordan, Agent." It was later changed back to "Carl R. Jordan." When it was first changed to an express agency account he had been sued for a small indebtedness. He expected the bank to be garnished. It was garnished. Before the garnishment was served he asked for this change in the account, explaining the purpose of it. He testified that he told Mr. Beall, the bank's cashier, in that connection that the money he had in the bank belonged to Doherty and Company, and he didn't want to lose it. The bank cashier answered the garnishment that the bank was not indebted to Jordan. This was about the time he was dealing heavily through the bank. The two years he was there his bank transactions amounted to approximately $250,000. He admitted forging the signatures of Munkres, Andrews, and Bangerter on their stock certificates. As to at least some of them, he said he wrote them thereon in the bank. He testified that when the bank called on him to pay a note on which he had pledged shares as security he had to sell the shares thus pledged in order to make payment, and he told them at the bank that was the only way he could pay. His shortage started in 1927, and in the spring of 1928 his indebtedness to the bank was approximately $17,000. Henry L. Doherty and Company had an office in the Oklahoma State Bank building when Jordan came to Enid. The former agent's name was rubbed out and Jordan's put in its place. The bank's cashier saw the changed sign.

There was testimony about plaintiff's exhibit 5 which reads thus:

"Bond Power Irrevocable.

"For Value Received ――― hereby sell, assign and transfer unto ――― the within Bond Debenture Note, of ――― represented by Certificate ――― and do hereby irrevocably constitute and appoint ――― attorney to transfer the said bond debenture note on the books of the ――― with full power of substitution in the premises. Dated ―――

"Signature of Transferor"

Mr. Marshall, an employe of Doherty and Company, was manager of the company's office at Wichita. Jordan in his transactions was said to be within the Wichita jurisdiction, and he made reports of his business through that office. That office in turn seems to have reported to the Doherty office at Kansas City. Mr. Marshall testified that exhibit 5 was a power of attorney or a stock power, and they were used only in event a sale was made on deposit, and that such power had to accompany the order and check that came through his office; that the power followed the transaction through to the transfer agent, was shipped back to the bank with draft attached, at which time if the customer failed to take up the draft the securities were shipped back, and the power gave Doherty and Company power to transfer the securities out of the customer's name; that if the customer got his stock he also got the power with the request that he destroy it. Jordan testified that he took from each of the parties to whom he agreed to sell stock such a power; that he sent it with the $5 per share for the stock; that it came back to the bank with each of the certificates for shares, remained there until he paid his notes after the shares had been sold, and was delivered to him with his cancelled note. He seems to faintly claim that that power gave him authority to sign the name of each stockholder on the back of certificates for shares, which he did, although those shares had been fully paid for by the respective parties named above. He made these statements in the face of the fact that he further testified that when shares were fully paid for at the time the customer agreed to take them, said power was not taken from the customer, because it was unnecessary, but that he did get such power from these customers because he was then kiting stock. The bank cashier testified that he had no recollection of ever using that Bond Power except when Jordan had bonds belonging to Mary Potteiger up as collateral; that the bank relied in each instance on the power attached to the certificates for shares on the back thereof to which the share-owners' names had been forged by Jordan. Only two of the defrauded stock purchasers were interrogated about exhibit 5. Each testified that he had no recollection of signing such document. Obviously the bond power as shown by its terms was never intended for use with a stock certificate, and it was not used in the sale of shares in either instance here involved. It appears that Jordan on different and many occasions deposited bonds of various kinds with the bank as collateral. The exhibit and its purposes have no application to the

738

transactions here involved, and we regard the testimony in relation thereto as wholly immaterial.

 The proof was ample to inform the bank at the outset that Jordan was dealing with it as an agent of Henry L. Doherty and Company. The proof was both constructive and direct. In those dealings he and the bank were handling and disposing of property of others. Admittedly Jordan's conduct brought loss and damage to his principal, and it cannot be doubted that the bank aided and assisted Jordan in appropriating that property to his own use.

 The important questions are, Whether the bank's conduct in the light of what it actually knew constituted actionable negligence on its part; or if it was not so informed, Whether the facts and circumstances within its knowledge were such as to induce a reasonably prudent person in the banking business to have made investigation before acting by inquiring of Jordan's principal, or of Case, Andrews, Munkres, and Bangerter, and such failure constituted actionable negligence? The parties named were the only ones interested. If inquiries had been made the losses would not have occurred. In our opinion the bank was sufficiently informed as to the Andrews, Munkres and Bangerter transactions to render it liable in accepting their shares as collateral to Jordan's notes, in thereafter disposing of them, and in accepting the proceeds in payment of Jordan's obligations to it; but, if not, its course of dealing with Jordan and the facts and circumstances of which it was informed were sufficient to render it liable for not making inquiry. We place liability on it in the Case transaction on the latter ground, because the deposit of his check in the agency account was made only one month prior to the collapse and Jordan's confession. The other transactions preceded the one with Case in large part. The authorities upon which we rely to sustain that conclusion are these: Central National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693; Fidelity & Deposit Co. v. Farmers' Bank (C. C. A.) 44 F.(2d) 11; Duncan v. Jaudon, 15 Wall. 165, 21 L. Ed. 142; Geyser-Marion Gold-Min. Co. v. Stark (C. C. A.) 106 F. 558, 53 L. R. A. 684; Shaw v. Spencer, 100 Mass. 382, 97 Am. Dec. 107, 1 Am. Rep. 115; Gaston v. American Exchange Nat. Bank, 29 N. J. Eq. 98; Baker v. New York Nat. Exchange

Bank, 100 N. Y. 31, 2 N. E. 452, 53 Am. Rep. 150; Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059. The case last cited is instructive on the extent of protection that must be given to a bank in controversies of this character.

In our opinion the court below erred in finding for the bank. The judgment will be reversed with instructions to find for plaintiff, and give judgment accordingly. Reversed and remanded.

KENNEDY, District Judge (dissenting).

I regret that I do not find myself in harmony with the conclusions expressed in the prevailing opinion. A dissenting opinion is not only ordinarily fruitless, but is usually meaningless, unless some reason is given for the dissent. An outline of all of the evidence as set forth in a record containing some 250 pages would be impracticable, and yet a reading of the entire record is largely necessary to a proper disposition of the case. In the opinion of the court the statement of facts has been necessarily and commendably condensed, but I think there are other facts not mentioned or but lightly touched upon which should be brought more prominently into the picture.

The defaulting agent, Jordan, for a period of two years before his fall, enjoyed the very highest reputation in the community where he did business with the appellee bank, taking an active part in civic, religious, and other affairs of the city. No suspicion of irregularity in regard to his business relations arose in the minds of any one until he voluntarily went to his employer and confessed his defalcations. He had done business at the bank for a period of two years, borrowing money and pledging stocks and securities of different kinds, sometimes of his own ownership. No word ever came from his employer to the bank which questioned the right of Jordan, its agent, to handle its stock sales transactions in his own way, nor was any objection made to the fact that for two years he had handled all the funds received from stock sales as his own and transmitting his remittances to his employer in any manner in which he saw fit. He was regarded highly by his employer and praised by reason of the fact that he was able to qualify

in the $250,000 class of a stock salesman. By his customers as purchasers of stock, he was likewise trusted, in that he was armed with powers of attorney which enabled him to handle their stock in such manner as he might choose. While there is testimony of another agent that these instruments were taken for the purpose of cancelling the stock in the event it was not paid for when delivered, there is nothing in the evidence that the bank officials had notice of this limited purpose. The bank officials, however, did know in handling the stock that these powers of attorney were present and they were certainly evidence of consent on the part of the purchaser of the stock for Jordan to handle it. The bank received no compensation out of the transactions except exchange and its interest on the float while the drafts were out. Jordan had done a quarter of a million dollars' worth of business through the bank on account of his agency without any irregularity in any way until the transactions occurred which are the basis of this suit. Many of these manifold transactions involved signatures on stock certificates. On the face of it the most outstanding element, tending to signify carelessness on the part of the bank cashier, was in witnessing signatures which Jordan represented to be genuine but later proving to be his forgeries. In the first place, it was no part of the cashier's duty as shown by the record to witness such signatures as genuine and therefore any act of the cashier in volunteering this service would be ultra vires and should not bind the bank. I think the cases cited so hold. But considering it as a fact, it does no more than to demonstrate the good faith of the bank and its confidence in Jordan, who represented the signatures as genuine. There is no evidence that any bank official ever saw Jordan forge the name of a certificate holder. Jordan, the agent, came from the penitentiary and testified for the plaintiff in the case, but I believe that under such circumstances where there is a discrepancy between his testimony and that of the bank officials, I would prefer to resolve the benefit of the doubt in their favor rather than in favor of the embezzler and crook.

In an analysis of the situation, I rely upon American Surety Co. v. Citizens' National Bank (C. C. A.) 294 F. 609, in which the same learned judge who here renders the opinion, spoke for the court in that case. Sound principles were there laid down which I believe are applicable to the case at bar. The rule which applies between a bank and its depositors bringing about the relationship of debtor and creditor is not applicable in a case like this. Before a surety may sue a third party with whom he has no contractual relations, it must appear that there was negligence on the part of the third person which contributed to the loss and that he must have participated with notice in the illegal act which brought about the loss. The right of subrogation is an equitable right and where equities are equal the right does not exist and no relief should be given. I am unable to say that from the entire record in this case there is a showing of negligence on the part of the bank which should entitle the surety company to recoup its losses from it.

It seems to me an anomalous situation, where an employer has absolute confidence in its agent, where the agent's customers and purchasers of his stock have absolute confidence in him to the extent of giving him powers of attorney, where the entire community in which the agent resides and transacts his business has entire confidence in his integrity over a period of years, and where the same general line of business transactions was carried on by the agent with the bank over a period of years in which no discrepancy or irregularity appeared, that the bank should be stuck for the loans accruing through his defalcations upon the meagre showing of irregularities in this case. Our own experience teaches that agents of various kinds, sales agents, insurance agents, and the like, do business with banks in their own names, handling collections and disbursing agency funds in the regular course of business. I think it is a harsh rule which makes the bank suffer the loss under the circumstances revealed in this case, instead of the surety company which made its contract for a consideration to respond to such a loss.