## MANHATTAN BANK OF MEMPHIS *v.* WALKER.

## WALKER *v.* MANHATTAN BANK OF MEMPHIS.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF TENNESSEE.

Nos. 205, 682. Argued March 14, 15, 1889. — Decided April 8, 1889.

A state bank gave a receipt or certificate, stating that J., agent for W., had placed with it, on special deposit, $5200 of railroad mortgage bonds, and a note for $5000. The receipt was sent by the bank by mail directly to W., on the request of J. At the same time the bank entered the note and the bonds in its special deposit book as deposited by J., agent for W. Afterwards, with the concurrence of J., but without authority from W., the bank discounted the note and applied its avails to pay a debt due to it from a firm whose business J. managed, and delivered up the bonds to J., knowing that he intended to pledge them as security to another bank for a loan of money to the same firm. The bank also knew that J. held the note and bonds as investments for W., and that it was not a safe investment to lend their avails to the firm: *Held*, that the bank was liable to W. for the amount of the note and the value of the bonds.

A suit in equity by W. against the bank for the return of the property or the payment of its value, would lie, as it was a suit to charge the bank, as a trustee, for a breach of trust in regard to a special deposit.

IN EQUITY. The case is stated in the opinion.

*Mr. S. P. Walker, Mr. C. W. Metcalf* and *Mr. L. Lehman,* for Walker, cited: *National Bank* v. *Graham,* 100 U. S. 699; *Foster* v. *Essex Bank,* 17 Mass. 479; *S. C.* 9 Am. Dec. 168; *Stewart* v. *Frazier,* 5 Alabama, 114; *James* v. *Greenwood,* 20 La. Ann. 297; *Honig* v. *Pacific Bank,* 73 California, 464; *Chattahoochee Bank* v. *Schley,* 58 Georgia, 369; *Loring* v. *Brodie,* 134 Mass. 453; *Duncan* v. *Jaudon,* 15 Wall. 165; *Smith* v. *Ayer,* 101 U. S. 320; *National Bank* v. *Insurance Co.,* 104 U. S. 54; *Shaw* v. *Spencer,* 100 Mass. 382; *Alexander* v. *Alderson,* 7 Baxter, 403; *Osborn* v. *Bank of the United States,* 9 Wheat. 738; *Parker* v. *Gilliam,* 10 Yerger, 394.

*Mr. T. B. Turley,* for the bank, cited: *Jones* v. *Smith,* 1 Phillips Ch. 244, 256; *Potter* v. *Gardner,* 12 Wheat.

503; *Wormley* v. *Wormley*, 8 Wheat. 447; *Clyde* v. *Simpson*, 4 Ohio St. 445; *Champlin* v. *Haight*, 10 Paige, 274; *Foster* v. *Essex Bank*, 17 Mass. 479; *S. C.* 9 Am. Dec. 168; *Giblin* v. *McMullen*, L. R. 2 P. C. 317; *Chattahoochee Bank* v. *Schley*, 58 Georgia, 369; *Ray* v. *Bank of Kentucky*, 10 Bush, 344; *Lloyd* v. *West Branch Bank*, 15 Penn. St. 172; *S. C.* 53 Am. Dec. 581; *Scott* v. *National Bank of Chester Valley*, 72 Penn. St. 471; *First Nat. Bank of Carlisle* v. *Graham*, 79 Penn. St. 106; *Tompkins* v. *Saltmarsh*, 14 S. & R. 275; *Smith* v. *First National Bank*, 99 Mass. 605; *S. C.* 97 Am. Dec. 59; *Lancaster County Bank* v. *Smith*, 62 Penn. St. 47; *Wiley* v. *First Nat. Bank*, 47 Vt. 546; *First Nat. Bank* v. *Ocean Nat. Bank*, 60 N. Y. 284, 294, 5; *Haynie* v. *Warring*, 29 Alabama, 263; *Lampley* v. *Scott*, 24 Mississippi, 528.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a suit originally brought in the Chancery Court of Shelby County, Tennessee, by Eliza Walker against the Manhattan Bank of Memphis, a Tennessee banking corporation. The suit was removed by the plaintiff into the Circuit Court of the United States for the Western District of Tennessee. The bill of complaint and the answer were both of them put in before, and the replication was filed after, the removal of the cause.

The bill prays for a decree for the return to the plaintiff of $3000 of the second-mortgage bonds of the Memphis and Charleston Railroad Company, and $2200 of the second-mortgage bonds of the Mississippi Central Railroad Company, and of a promissory note for $5000, made by Edward Goldsmith, and of certain shares of the capital stock of the defendant, amounting to $6000, attached to the said promissory note as security therefor. The bill alleges that the defendant, in the course of its business, and on the 27th of November, 1880, received on special deposit the above-named bonds, promissory note and shares of stock, belonging to the plaintiff, together with a certificate of the stock of the People's Insurance Company, for $1100, and four promissory notes for $325 in the aggregate; that the said bonds had coupons attached thereto

for the interest payable thereon at certain stated periods; that the defendant gave its obligation in writing, as evidence of the receipt on special deposit, from the plaintiff, of the said securities, and was bound to deliver them to the plaintiff on demand; and that the stock of the People's Insurance Company, and the $325 of notes, were returned to her, but the bonds and the coupons attached thereto, and the note of Goldsmith, and the bank stock were never returned to her, although she made demand upon the defendant for them. The bill prays for a decree for the return of the property, and for the amount of the decline in its value from the time when she demanded it until the time when it shall be restored; and, if not restored, then for a personal decree against the defendant for the highest value of it at any time since she first made demand for it to the date of the decree, with interest.

The answer sets up in defence, that, for some time prior to November, 1880, Mr. G. H. Judah, a brother-in-law of the plaintiff, kept an account and had transactions with the defendant, in which he styled himself sometimes agent, and sometimes guardian, but without disclosing for whom he was agent or guardian; that he made deposits and drew checks in that way on his account, as the other depositors with the defendant did, and, at different times, prior to November, 1880, bought the bonds and insurance company's stock named in the bill, and paid for them by checks on his account with the defendant; that, as he would buy those securities, he would leave them on deposit with the defendant, without taking any receipt for them; that, in the fall of 1880, he left with the defendant the Goldsmith note and the collateral therefor, and the four other notes mentioned in the bill; that those notes were payable to the said G. H. Judah as agent simply, without saying for whom he was agent; that, prior to November 27, 1880, he had never told the defendant whether he had any principal or not, or who his principal was, or for whom he was guardian, if for any one; that on or about that date, he asked the defendant to give to him, as agent for the plaintiff, a receipt for the bonds, stocks and notes, telling it at the time that he was the plaintiff's general agent for the management and control of

those securities and notes; that the defendant gave to him a receipt as such agent; that, after the receipt was given, some of the notes described in it were paid while they were on deposit with the defendant, and the said Judah, as agent of the plaintiff, drew out the money in the ordinary way, and from time to time, as agent of the plaintiff, withdrew from the custody of the defendant the items mentioned in the receipt, until he had withdrawn them all, when he gave to the defendant a receipt for them, in which he acknowledged having received them as agent for the plaintiff; that, if the plaintiff owned the items, Judah had authority from her to control and manage them, as fully as she could have done as owner, if they had been in her actual possession, instead of in his possession as her agent; that he was her general agent with reference to them, and had power not only to deposit them, but also to withdraw them from deposit, if he saw fit; that, when he demanded them from the defendant, his agency was still in force, and the defendant could not legally have refused to give them up to him as the agent of the plaintiff; that, upon returning them to Judah, as such agent, all liability of the defendant with reference to them ceased; and that the defendant is not indebted to the plaintiff on account of said securities.

Proofs were taken on both sides, and the cause was heard; and the court made a decree adjudging to the plaintiff a recovery against the defendant of $5000, being the amount of the Goldsmith note, with $1175 interest thereon from the date of its maturity, November 1, 1881, on the ground that the defendant had collected the amount of that note and appropriated the same to its own use, and further decreeing that the defendant was not liable to the plaintiff for any of the other items mentioned in the bill, and that neither party should recover costs from the other. Each party has taken a separate appeal to this court.

The answer does not set up, as a defence, that the defendant was not authorized to receive the property in question as a special deposit, or to give the receipt therefor. It was stipulated between the parties that the defendant received no compensation, as bailee, for the custody of the property sued for;

that the Memphis and Charleston Railroad bonds bore seven per cent interest, payable semi-annually, and evidenced by interest coupons maturing January 1 and July 1 in each year, the bonds maturing on the 1st of January, 1885; and that the Mississippi Central Railroad bonds bore eight per cent interest, payable semi-annually, and evidenced by coupons maturing February 1 and August 1 in each year, the bonds maturing on the 1st of February, 1885.

The suit is plainly one of equitable cognizance, the bill being filed to charge the defendant, as a trustee, for a breach of trust in regard to a special deposit.

The opinion of the Circuit Court, reported in 25 Fed. Rep. 247, contains so full and accurate a statement, in the main, of the facts of the case, developed by the proofs, that we repeat and adopt it, as follows: "The firm of Walker Bros. & Co., composed of the plaintiff's husband, his brother and G. H. Judah, was a large mercantile house in Memphis that disastrously failed and made an assignment. The plaintiff and the wife of the other brother, being creditors of the firm for large amounts due them for loans to the firm, owned the book accounts, which were bought for their use by Judah in the name of Maas, the book-keeper, at the assignee's sale, the husband of plaintiff paying for her share. These books, with the knowledge and consent of plaintiff and her husband, who afterwards died — but it seems without any specific instructions of any kind — were left with Judah to collect the debts and manage the fund for the two beneficiaries, who resided in other cities. His control over the funds was of the most plenary character. He married a sister of the two brothers, and had been the most active member of the firm and was best acquainted with its business. The collections were deposited with the defendant bank in his name as 'guardian,' or in the name of Maas, the former book-keeper of the firm, who became the book-keeper and assistant cashier of the defendant bank. Prior to November 27, 1880, Judah had purchased certain securities with the funds, which he kept on special deposit with the bank or in the name of Maas. On that day he came to the bank and asked Maas for a receipt,

showing the special deposit, to send to the plaintiff. The bank was not in the habit of giving receipts or certificates for these special deposits, but kept them noted by numbers in a book used for that purpose. Maas wrote a receipt on a sheet of the bank's letter-paper, and according to his and Judah's testimony, placed it in one of the bank's envelopes addressed to the plaintiff, and put it with the bank's mail. The plaintiff and her daughter swear that it was accompanied by a letter from Maas. What was in the letter does not appear, and, not being preserved, it has not been produced, but is supposed to have been burned as useless. The routine of the bank was that Goldsmith, the cashier, personally signed and inspected every letter and himself enveloped and addressed them. This letter he did not see or sign, and it was never copied into the letter-press. The receipt was as follows:

'Manhattan Bank of Memphis.

'L. Levy, president; L. Hanauer, vice-president; E. Goldsmith, cashier; M. Maas, ass't cashier.

'MEMPHIS, TENN., *November* 27, 1880.

'G. H. Judah, Esq., agent for Mrs. Eliza Walker, of Philadelphia, has placed with us on special deposit:

'$3000, Memph. & Charl. R. R. 2d-m'tg. bonds.

'$2200, Miss. Central      "      "      "

'$1100, People's Insurance Co. stock.

'$5000, note E. G., and collateral attached, $6000 M. Bank stock.

'$325, interest notes (4 @ $81.25).

'MAURICE MAAS,
'*Ass't Cashier.*'

"Some time in 1880 the son of the plaintiff and a son of the other Walker, both young men, commenced business at Memphis as Walker Sons & Co. This firm kept an account with the defendant bank, and later with the Bank of Commerce. It was 'never very strong' financially, and its business was cotton factorage. Judah was thought by Goldsmith to be a partner, and the plaintiff at one time swore he was a silent

partner, but afterwards stated she was informed he was not. He says he was only a salaried manager. The members of the firm were inexperienced, and Judah was, in fact, the almost sole manager of all its affairs — the master spirit of the concern. It is not shown that the young men took any part, except one of them kept the books after Maas had opened them.

"The plaintiff in October, 1880, lent to her son, the firm being also responsible, $10,000, as his capital in the concern, derived from the life insurance of her husband. Judah also appropriated or lent to the firm, from time to time, sums amounting to over $9000, from his collections in behalf of plaintiff on the old books. The interest on these sums and on the special deposit funds were remitted by the firm — not always promptly — to the plaintiff at Philadelphia, by exchange or checks; and sometimes the coupons were sent by express to her. When remittances were delayed she wrote or telegraphed the firm. She never communicated with the bank in any way. The remittances were nearly always in letters by her son, and they contained apologies and explanations for delays.

"The defendant bank made large advances to the firm, generally by discounts on the security of the firm's 'country paper' due from its customers. Judah promised the bank to always protect it as far as in his power, and the relation was very confidential. The bank began to urge him for a reduction of the account, and, not being willing to accommodate him fully, he opened an account with the Bank of Commerce. The Goldsmith note maturing November 1, 1881, he" [Goldsmith] "notified Judah that he should not longer need the loan. Maas and Judah say that 'a few days' before the note matured, Judah, being unable to continue the loan to Goldsmith, determined to lend the money to Walker Sons & Co.; and to accomplish that purpose the note of Goldsmith was discounted by the bank, and the proceeds placed to the credit of Walker Sons & Co. . . . At the same time, Judah urged a loan on the other securities of plaintiff on special deposit, but the bank declined this on the ground that cotton factors' ac-

counts were not desirable to a bank with so small a capital.
. . . The bank did not make the loan, because Judah was
unwilling to pay the money on the old account. He could get
the money at the Bank of Commerce. He told the officers of
the defendant bank so, and they delivered the securities to
him, fully knowing that he was going to make that use of
them. Maas consulted the president and the attorney whether
he should deliver the securities to Judah, and they directed
him to do so. He had forgotten, however, giving him the re-
ceipt and sending it to plaintiff, and neither the president nor
the attorney knew that fact. Goldsmith, the regular cashier,
was absent in New York, but he never knew that fact. Maas
never mentioned it, because, he says, he deemed it unimpor-
tant at the time and forgot it afterwards. The securities were
pledged to the Bank of Commerce, except the People's Insur-
ance stock, which was on the books in plaintiff's name and
could not be used by Judah. They were sold by that bank to
satisfy the loan, and are lost to plaintiff. The firm of Walker
Sons & Co. soon after failed disastrously, owing defendant
bank a balance of over $5000, notwithstanding Judah, accord-
ing to his promise, appropriated to the debt certain stocks of
his own, and his diamonds. After the failure, Kramer, a son-
in-law of plaintiff and a lawyer, came to Memphis and pre-
sented the receipt, and then the plaintiff learned, for the first
time, that the securities had been so used by Judah and the
bank. Kramer secured the delivery to himself of certain
'country paper' and mortgages to secure notes that were then
first taken for $20,000 lent by plaintiff to the firm, not includ-
ing, however, the securities in controversy here. An angry
lawsuit grew out of this transaction, in this family, in the
courts of Arkansas. A New York gentleman, nephew of the
other young Walker, filed a bill stating that the securities be-
longed to him to secure his guaranty of a loan by the Import-
ers and Traders' Bank of New York to the firm for some
$26,000, and that he had sent them to the firm for collection,
and that they were, by the plaintiff's son, and without consent
of the other Walker or Judah, turned over to his own mother;
all of which was denied, and the averment made that this

scheme was trumped up to defeat plaintiff of her advantage and enable Judah to continue business on the assets at Indian Bay, Arkansas."

The Circuit Court held that the defendant was liable for the amount of the Goldsmith note and interest from the date of its collection, because it had collected the money and never paid it to the plaintiff, but had, without due authority, appropriated it to its own use, on account of the debt due to it from Walker Sons & Co. As to the $5200 of bonds, the court held that knowledge by the defendant of the intended breach of trust by Judah did not make the defendant privy to it and liable for it, as the defendant did not participate in the profits of the fraud; that the receipt given by the defendant did not change the relation of Judah to the property and to the defendant, as it was not a receipt to the plaintiff but one to Judah; and that it did not satisfactorily appear that the defendant received any part of the money advanced on the bonds.

We are of opinion that the plaintiff is entitled to recover, not only in respect to the Goldsmith note, but in respect to the $5200 of bonds.

In regard to the Goldsmith note, shortly before it matured, in November, 1881, Judah indorsed it over to the defendant as collateral security for a note of larger amount, made by Walker Sons & Co., which the defendant then discounted at the instance of Judah. The proceeds of that discount were, to the extent of $6000, applied by the defendant upon a debt antecedently existing from Walker Sons & Co. to it. When the Goldsmith note became due, in November, 1881, the defendant, claiming to be the owner of it, collected it and retained the proceeds. Thus a note which confessedly, and to the knowledge of the defendant, belonged to the plaintiff, was diverted to the use of the defendant by the co-operation of it and of Judah. Judah, if not a partner in the firm of Walker Sons & Co., was, to the knowledge of the officers of the defendant, the active and controlling manager, both in its business with the defendant and otherwise, of the affairs of that firm. Maas, the assistant cashier of the defendant, and

who was his acting cashier during the period of the transactions in question, was, before his connection with the defendant, the confidential book-keeper of the prior firm of Walker Bros. & Co., of which Judah was a member, and had a close personal intimacy with Judah. When the book accounts of Walker Bros. & Co. were sold, Maas bought them, on behalf of the plaintiff and her sister, and the funds realized from that purchase were in part deposited in the name of Maas, with the defendant; and Maas, on the request of Judah, opened the books of Walker Sons & Co., when that firm was formed. Judah promised Maas that he would certainly protect the defendant in case of disaster to the firm of Walker Sons & Co.

At the time the Goldsmith note was thus converted, the condition of Walker Sons & Co. was precarious, if the firm was not insolvent. Before the conversion of the railroad bonds, Judah pledged to the defendant certain stocks belonging to himself, for the debt due to it by Walker Sons & Co.; and it is apparent that Judah was constantly being pressed by the defendant to make payments on the firm's debt to it, and that Maas, being the acting cashier of the defendant, knew, from the state of the account which the firm kept with the defendant, that it was substantially without available funds. In none of the transactions between the defendant and Judah in regard to the Goldsmith note and the bonds, was the receipt or certificate which had been sent to the plaintiff redelivered to the defendant; and the defendant knew that it had gone into the hands of the plaintiff, because it had been sent to her by mail directly from the defendant.

In *National Bank* v. *Graham*, 100 U. S. 699, one Graham had deposited in a national bank certain bonds of the United States for safe-keeping, and had received from the cashier a receipt setting forth that fact, and that the bonds were to be redelivered on the return of the receipt. Before and after that time, the officers of the bank were accustomed to receive such deposits from others, and they were entered in a book kept by the bank. The bonds were stolen from the custody of the bank, through its gross negligence. On this state of

facts, this court said, (p. 702:) "If a bank be accustomed to take such deposits as the one here in question, and this is known and acquiesced in by the directors, and the property deposited is lost by the gross carelessness of the bailee, a liability ensues in like manner as if the deposit had been authorized by the terms of the charter." In support of this proposition, the court cited the cases of *Foster* v. *Essex Bank*, 17 Mass. 479; *Lancaster Co. Bank* v. *Smith*, 62 Penn. St. 47; *Scott* v. *Bank of Chester Valley*, 72 Penn. St. 471; *Bank of Carlisle* v. *Graham*, 79 Penn. St. 106; *Turner* v. *Bank of Keokuk*, 26 Iowa, 562; *Smith* v. *Bank of Westfield*, 99 Mass. 605; *Chattahoochee Bank* v. *Schley*, 58 Georgia, 369.

We are of opinion that the execution of the receipt or certificate in question, and its transmission by mail directly by the defendant to the plaintiff, created the relation of bailor and bailee between her and the defendant, and made it an act of gross negligence for the defendant to deliver, or dispose of, or appropriate the securities in question, on the sole request of Judah, and without her direct authority. Under the circumstances of the case, the receipt having been made out by Maas, the assistant cashier, and sent by him to the plaintiff, on the request of Judah made on her behalf, the statement in the receipt that Judah, agent for the plaintiff, had placed the securities with the defendant on special deposit, must be regarded as virtually a statement that the plaintiff, by Judah as her agent, had placed the securities with it on special deposit.

Maas's statement, in his testimony, is, that Judah came to him, while he was in the discharge of his duties in the bank, "and said he wanted a receipt, or a statement rather, of what securities he had there on special deposit, to send to Mrs. Walker in Philadelphia. . . . He said Mrs. Walker wanted to know what she held. . . . About that time, on our special deposit book, these bonds and note and stock, mentioned in said receipt, were entered as deposited by G. H. Judah, ag't Mrs. Eliza Walker." Maas further states that Judah never exhibited any authority to him or to the bank, to dispose of the note and the bonds and securities mentioned in the certificate which was sent to Mrs. Walker.

Judah testifies that the instructions of the plaintiff to him did not, directly or indirectly, authorize him to pledge any bonds or securities obtained with her money, for his own debts or the debts of others, and that his power was limited to invest her moneys for her exclusive benefit and use.

It is very clear that Judah had no power, either in fact or in law, to pledge the Goldsmith note as security for an existing debt of Walker Sons & Co. to the defendant. Such act was not an investment of the trust fund, and the officers of the defendant knew that it was not. *Duncan* v. *Jaudon,* 15 Wall. 165; *Smith* v. *Ayer,* 101 U. S. 320; *National Bank* v. *Insurance Co.,* 104 U. S. 54; *Shaw* v. *Spencer,* 100 Mass. 382; *Loring* v. *Brodie,* 134 Mass. 453.

It is urged on the part of the defendant, that Judah, as agent of the plaintiff, collected the book accounts of Walker Bros. & Co.; that he deposited the moneys collected with the defendant, to his credit as guardian; that out of those funds he made loans to Walker Sons & Co., to which the plaintiff did not object; and that he bought the securities in question with moneys belonging to the same fund. But, from the fact that the plaintiff had lent to the firm of Walker Sons & Co. other moneys, it does not follow that, after the giving of the receipt in question, authority from her to dispose of the securities so placed with the defendant on special deposit, is to be inferred. Her demand upon the defendant, through Judah, for the receipt showing the special deposit, and the sending of such receipt directly to her by the defendant, changed the relations of herself and Judah and the defendant, to the securities deposited. The defendant knew, as well as did Judah, that an investment of the proceeds of any of the securities in a loan to Walker Sons & Co., was not a safe investment. It also knew that the appropriation of the proceeds of the Goldsmith note towards paying a debt due to it by Walker Sons & Co., was an unlawful appropriation; and that the securities covered by the receipt were held as investments, and were the property of the plaintiff. So far as the collection of the interest on the Goldsmith note and on the bonds was concerned, when the moneys collected in fact reached the plaintiff, the transactions

were completed; and no argument can be drawn from them in support of any implied authority to Judah or to the defendant to divert or appropriate the principal of the securities.

The views above stated, as applicable to the Goldsmith note, apply also, very largely, to the $5200 of bonds. Under the terms of the receipt, the plaintiff was the bailor and the defendant was the bailee, in respect of the bonds, equally with the note. The defendant was not the bailee of Judah, so as to be authorized to deliver the bonds to Judah without the authority of the plaintiff. The defendant had no right to deliver the bonds to Judah, when it knew that Judah intended to deliver them to the Bank of Commerce as collateral security for a loan of money to be made by that bank to Walker Sons & Co.; and this, without regard to the question whether or not the defendant was to receive, or did receive, any part of the money borrowed from the Bank of Commerce. Judah applied to the defendant for a loan of money for Walker Sons & Co. on the bonds. Maas, representing the defendant, declined to make the loan. On receiving such refusal, Judah stated to Maas that he could probably get the money at the Bank of Commerce. Afterwards, he called upon Maas for the bonds, and told him he had got the money at the Bank of Commerce; and Maas knew, when he handed the bonds to Judah, that Judah received them with a view to a loan to be made by that bank to Walker Sons & Co., and Maas also knew at that time that Judah was the agent of Walker Sons & Co. By the face of the receipt, the defendant recognized the plaintiff as the true owner of the bonds, her name being mentioned in it; and it was capable of no other construction than that the plaintiff owned the securities mentioned. Knowing, from what passed between Maas and Judah, that the bonds were to be used to raise money for the benefit of Walker Sons & Co., and knowing that such use was an improper disposition of the bonds, unless the transaction were affirmatively and directly sanctioned by the plaintiff, the defendant became a party to the misappropriation of the bonds. It is immaterial, in this view, whether or not the defendant received any portion of the money loaned by the Bank of Commerce on the security of the bonds.

It results from these vie⁻ s that

> *The decree of the Circuit Court must be r₋₋₋ʰsed, and the
> case be remanded to that court with a direction to enter a
> decree in favor of the plaintiff, not only for the amount
> of the Goldsmith note, namely, $5000, with interest from
> November 1, 1881, but also for the proper value of the
> $5200 of bonds, with proper interest, such value and inter-
> est to be ascertained by the Circuit Court, and the plaintiff
> to recover costs in this court on both appeals, and costs in
> the Circuit Court.*