670

**UNITED STATES v. BENNETT et al.**
No. 302.

District Court, E. D. Washington, N. D.
Nov. 8, 1944.

Edward M. Connelly, U. S. Atty., B. H. Ramsey, Joseph L. Thomas, and Ernest Falk, Sp. Attys., United States Department of Justice, Lands Division, all of Spokane, Wash., for petitioner.

L. H. Brown and L. E. Gandy, both of Spokane, Wash., for defendant M. G. Swanson et al.

John T. Raftis, of Colville, Wash., for defendants Spokane Portland Cement Company and Charles E. Bennett for the W. N. Bennett Estate.

George W. Young, of Spokane, Wash., for Howard C. Price Estate and heirs.

Edward J. Crowley, of Spokane, Wash., for defendants Richard C. Parnell and Thelma S. Parnell.

SCHWELLENBACH, District Judge.

This proceeding is to determine the persons entitled to the compensation to be awarded in this action in which the petitioner is condemning 340 acres of land in Stevens County, Washington. The land is being condemned for use as a dolomite quarry. The declaration of taking was filed November 16, 1942, and on that date a deposit of $10,000 was made with this Court. 40 U.S.C.A. § 258a. The principal controversy involves tract 3 of the condemned property on which the dolomite is located. By agreement between all parties involved, extended hearings looking to a decision of the question of title have been held prior to the jury trial on the question of value.

Tracts 3 and 4 are a part of a large ranch which, sometime prior to 1938, was acquired by W. G. Wrenn, of Kansas City, Missouri. On September 7, 1938, Wrenn sold the property to the defendant M. G. Swanson. Swanson gave Wrenn some stock in a company operating at Deer Park, Washington, and also gave him a purchase money mortgage in the principal sum of $30,000. Swanson paid nothing on the mortgage, either principal or interest, and paid no taxes. On July 31, 1941, Wrenn traded his mortgage to the defendant Parnell, who sent one Bennett here as his agent under an oral agreement that Bennett would get half out of whatever he could secure from the sale or the working out of the mortgage.

The defendant Spokane Portland Cement Company (hereafter called the Cement Company) had for many years operated a lime quarry on nearby property. In April,

1941, Swanson was taken to the psychiatric ward of the St. Luke's Hospital and kept under observation for seventeen days. Swanson, on August 31, 1939, executed a deed to one-half interest in the property to the defendants Price and Crary. In December, 1941, Bennett, on behalf of Parnell, employed Mr. Raftis, an attorney at Colville, to foreclose the Swanson mortgage. In the foreclosure action, which was started December 9, 1941, Parnell and his wife were plaintiffs by virtue of an assignment of the note and mortgage dated December 3, 1941, although the acknowledgment of the assignment of the mortgage was dated December 11, 1941, and was filed for record December 17, 1941. Process was served upon the Swansons on December 9, 1941. Defaults were entered against the Swansons and Prices and Crarys in that action. Judgment and decree of foreclosure were entered on March 13, 1942. The plaintiff bid in the full amount of the mortgage with interest and costs in the sum of $36,586.33. The certificate of sale to Parnell and his wife was issued April 22, 1942. The sale was confirmed on September 18, 1942.

On December 15, 1941, Bennett agreed with the Cement Company to sell certain ties to be produced from timber on the ranch and got an advance from the Cement Company of $500. On December 16, 1941, he used $200 of this money to secure from the Swansons a quit claim deed to Mrs. Bennett to the mortgaged premises. It was stipulated here by the Cement Company that the sole purpose of the quit claim deed was to secure for the Bennetts the possession of the property during the pendency of the foreclosure proceedings and that no wider application of the quit claim deed should be made. A few days thereafter Bennett received from Parnell $200. Upon receipt of the latter, he told Parnell that he had used the money to obtain the quit claim deed. He did not mention the securing of the $500 from the Cement Company and he asked for and received from Parnell further money with which to pay the laborers for getting out the ties. This was only one of a number of instances where Bennett solicited and received money from Parnell under a misrepresentation. Shortly after that, Parnell entered the military service and was stationed at Fort Snelling, Minnesota.

Commencing as early as November 27, 1941, general discussion ensued in this area concerning the possibility of the establishment at Spokane of a plant in which magnesium would be manufactured from dolomite through the use of an electrometallurgical process. There were introduced in evidence a number of newspaper clippings from Spokane papers dated between November 28, 1941, and May 1, 1942, devoted to the discussion of the possibility of the establishment of such a plant. It was clear from the beginning and a matter of general knowledge in Spokane that two of the factors that caused the area to be considered for the establishment of such a plant were the available supply of electric power plus the supply of dolomite located in Stevens County. In February, 1942, representatives of the electrometallurgical company went to Stevens County in company with officers of the Cement Company to make investigations of the property here involved. Core drillings were later necessary before final determination as to acquisition of the site. During this time, the officers of the Cement Company and Bennett both knew of the existence of a substantial dolomite deposit upon this property. They did not then know of the facts later ascertained and testified to by the Cement Company's assistant manager, Fosseen, that the deposit, over a period of years, would have a value to the Cement Company of between five hundred thousand and a million dollars. They must have known, however, that substantial value existed if the development of magnesium from dolomite was developed as a permanent industry in the Spokane area. The Cement Company officials knew at the time that Parnell owned this mortgage. Despite that fact, on March 24, 1942, the Cement Company took an option from Bennett for the purchase of the 160 acres including the dolomite site. It agreed to pay Bennett $10,000. Of that sum, the $500, which the Cement Company officers testified had been paid for ties December 15, 1941, was considered as the first advance on the option; the Company loaned Bennett $1,500 on the date of the execution of the option and agreed to pay him the additional $8,000, at the rate of $600 per month during the first seven months following the acceptance of the option and $100 per month until Bennett was paid in full. The Company was allowed four months to make core drillings before being called upon to exercise its option. During the months of February, March, and April, 1942, the Cement Company paid Bennett $864.05 for ties. It then proceeded to ad-

vance him monies on the option despite the fact that the core drillings had not been completed so that, by May 26, 1942, it had advanced an additional $7,600. For these advances, it took back Bennett's personal notes. On May 21, 1942, the option and agreement to purchase was extended to May 21, 1943. During April, 1942, the Cement Company officials and Bennett believing that Parnell was about to be sent overseas, Bennett went to Parnell's army camp and procured from him an assignment to him of the certificate of sale. The Cement Company advanced $275 for the expenses of his trip. The evidence shows that, while Bennett may have told Parnell that he had a deal on with the Cement Company, he did not tell him of the option for $10,000 nor did he tell him of the peculiar potentialities of the property in view of the new interest in its use for the production of dolomite.

During May, 1942, the Cement Company made an effort to purchase the equity of redemption from Swanson and Price and Crary. A number of meetings were held between the individuals and the company officials and the lawyers, and, at some of these meetings, the local representatives of the Defense Plant Corporation, a subsidiary of the R. F. C., attended. The amount demanded by Price and the terms exacted by him were impossible and nothing came of these negotiations. On July 13, 1942, the Bennetts entered into a separation agreement and property settlement under which Grace Bennett assigned to Bennett all of her interest in the option agreement and this property. In the latter part of October, 1942, Bennett was taken to St. Luke's Hospital for alcoholism. The Cement Company paid his hospital and nursing bills and on November 11, 1942, Bennett assigned to the Cement Company that portion of the certificate of sale applicable to the involved property. He then committed suicide on November 21, 1942. On April 28, 1943, the assignment from the Parnells to Bennett and the partial assignment from Bennett to the Cement Company were filed of record and thereupon the Bennett estate received the sheriff's deed for the remainder of the property and the Cement Company received the sheriff's deed to tract 3.

In these proceedings, the Cement Company claims the right to receive the entire award by virtue of its sheriff's deed. Swanson's son filed an affidavit asserting that his father was mentally incompetent and could only be represented by a guardian ad litem. Consequently, I appointed Mildred Swanson Soderberg, a daughter of Swanson, as the guardian ad litem. She contends that the Swansons are entitled to receive that portion of the award which might exceed the amount of the mortgage. She attacks the mortgage foreclosure on the ground that Swanson was insane at the time and that no guardian was appointed for him in the foreclosure proceedings and on the further ground that Wrenn's assignment to Parnell was not acknowledged until after the commencement of the action. She further contends that, as of the date of the declaration of taking, the title to the property was in Swanson subject only to the mortgage lien which the issuance of the certificate of sale did not ripen into title. During the pendency of the action, Price died and his interests are represented by his widow who also purchased the interest of Crary. Ella Price, the widow, asserted a claim for one-half interest in the award. During the trial, Mrs. Price sold all of her interest in the litigation to the Swansons. It, therefore, becomes unnecessary to consider the contentions of Mrs. Price. Major Parnell did not appear. He employed no counsel and indicated his willingness to permit default to be taken against him. However, after hearing a part of the testimony, I determined it was my duty, under the Soldiers' and Sailors' Relief Act of 1940, 50 U.S.C.A.Appendix § 520(3), to appoint an attorney to represent him. At the conclusion of the trial, I continued the hearing to a later date to permit Major Parnell's case to be introduced and he came to Spokane on leave for one day and presented his testimony. It is not the purpose of this proceeding to determine value. However, it appears from the vigor with which the parties are contesting it and the expense to which they have gone in preparation that everyone hopes that the jury's award will be far in excess not only of the $10,000 deposit, but also of the amount of the mortgage. I am not passing upon the question of value. When I refer to Fosseen's testimony concerning the long-term value of $500,000, I do so only as it may indicate what the Cement Company and Bennett may have had in mind when they were negotiating and dealing in 1942.

The determination of the persons entitled to compensation out of the award must be made as of November 16, 1942, the date of the filing of the declaration of tak-

ing. "For the reason that compensation is due at the time of taking, the owner at that time, not the owner at an earlier or a later date, receives the payment." Danforth v. United States, 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240. The award stands in the place of the property. Washington Water Power Co. v. United States, 9 Cir., 135 F.2d 541. Since, as of the date of taking the property had been foreclosed and a certificate of sale issued and assigned to the Cement Company, the question for determination is what was the legal position of the holder of the certificate of sale as of that date? Since the sale was conducted by authority of the state statute, Rem.Rev.Stats. of Wash. §§ 578 to 603 inc., the status of the party claiming under it must be determined on the basis of local law. Barrett v. Failing, 111 U.S. 523, 4 S.Ct. 598, 28 L.Ed. 505; United States v. State of Alabama, 313 U.S. 274, 280, 64 S. Ct. 1011, 85 L.Ed. 1327; Magruder v. Supplee, 316 U.S. 394, 396, 62 S.Ct. 1162, 86 L. Ed. 1555; Walsh-McGuire Co. v. Commissioner, 6 Cir., 97 F.2d 983, 984; Commissioner v. Plestcheeff, 9 Cir., 100 F.2d 62, 64. No matter what the rule may be elsewhere, in this State it is that a certificate of sale does not vest title. It is only an evidence of an inchoate estate that may or may not ripen into an absolute estate. Singly v. Warren, 18 Wash. 434, 51 P. 1066, 63 Am.St.Rep. 896; Cochran v. Cochran, 114 Wash. 499, 195 P. 224, 198 P. 270; Ford v. Nokomis State Bank, 135 Wash. 37, 237 P. 314; Bonded Adjustment Co. v. Helgerson, 188 Wash. 176, 61 P.2d 1267; Atwood v. McGrath, 137 Wash. 400, 242 P. 648; In re Fourth Avenue South, 18 Wash.2d 167, 138 P.2d 667. The most complete statement of the rule is contained in Cochran v. Cochran, supra, at page 503, of 114 Wash., at page 225 of 195 P.: "It has become the well-settled law of this state that a mortgage, unlike a mortgage at common law, does not vest title in the mortgagee, but only creates a lien upon the land in favor of the mortgagee as against the interest of the mortgagor, and that a foreclosure sale of the land looking to the satisfaction of the mortgage debt creates no greater interest in the land in the purchaser at such sale, during the period allowed by statute within which the mortgagor may redeem. In other words, the mortgagor is not by such sale divested of his title to the land prior to the expiration of the redemption period, and can even then be divested of his title only upon his failure to redeem during that pe-

riod." Therefore, it is apparent that all that Parnell or Bennett or the Cement Company had on the date of taking was a lien for the amount of the mortgage judgment.

■■ The determination of the extent of participation in the award must be made upon the basis of the federal statute and the federal law. Roberts v. Northern Pac. R. Co., 158 U.S. 1, 23, 15 S.Ct. 756, 39 L.Ed. 873; Deitrick v. Greaney, 309 U.S. 190, 200, 60 S.Ct. 480, 84 L.Ed. 694; American Surety Co. v. Bethlehem Nat. Bank, 314 U.S. 314, 316, 62 S.Ct. 226, 86 L.Ed. 241, 138 A.L.R. 509; United States v. Certain Lands in Borough of Brooklyn, 2 Cir., 129 F.2d 577–579; City of Oakland v. United States, 9 Cir., 124 F.2d 959, 964. The statute, 40 U.S.C.A. § 258a, provides: "The court shall have power to make such orders in respect of the encumbrances, liens * * * and other charges, if any, as shall be just and equitable." The question, therefore, must be determined on the basis of equity and justice. United States v. Certain Parcels of Land in City of San Diego, D.C., 44 F. Supp. 936; Cobo v. United States, 6 Cir., 94 F.2d 351; Welch v. Tennessee Valley Authority, 6 Cir., 108 F.2d 95. This court cannot ignore the congressional mandate that it should make such orders as shall be just and equitable. No one could deny the injustice or the lack of equity in a ruling which would deprive the Swansons of their interest in this property the redemption of which, after its value became known, was for practical purposes prevented by the condemnation proceedings. The two Washington cases upon which the Cement Company relies, Damon v. Ryan, 74 Wash. 138, 132 P. 871, Ann.Cas.1915A, 734, and In re Fourth Avenue South, supra, both involved the Washington condemnation statutes. They are not controlling in this Federal condemnation action. The Swansons are entitled to any portion of the award in excess of the amount of the mortgage judgment.

■ This disposition of this angle of the case would ordinarily make unnecessary any consideration of the other contentions presented on Swanson's behalf. However, in the light of the record, I feel constrained to discuss the question of the claim of insanity. Mr. Swanson has consistently opposed the presentation of this contention by his counsel and his guardian ad litem. I am convinced, after hearing all of the evidence, that Swanson is not now and was not in December, 1941, insane or mentally incompetent. That evidence consisted of

the testimony of several witnesses as to his peculiar actions, particularly in April, 1941, the hospital record at the time of his confinement, the testimony of two doctors, a number of letters that he wrote at the time and shortly after his confinement in the hospital and Mr. Swanson's own testimony. There can be no question but that Swanson suffered from serious mental abberations in April, 1941. He suffered the delusion that he had large contracts for the sale of potatoes and he wrote checks in varying amounts up to a million dollars. He was taken to St. Luke's Hospital on April 12, 1941, by Dr. Hodgson, a psychiatrist whose testimony as to his later conclusions is here in the form of a deposition. Because of clinical symptoms of paresis, a spinal puncture was done which was negative. He was kept at the hospital for seventeen days. At the end of that time, he was discharged with this notation by the doctor: "Believe recent mental attack is the result of worry plus the toxic condition associated with the flu." He then went back to the ranch and, as he testified, by the fall of 1941 he considered himself completely cured. When the summons and complaint in the foreclosure action were served upon him, he wrote an exceptionally intelligent letter to his lawyer in Spokane. He explained that he and his family saw no value in contesting this case but inquired as to his homestead right during the period of redemption and made particular inquiry as to the extent the property could be covered by a homestead. He left the property, however, and in February, 1942, secured a position as a roofing salesman. He has held that position continuously since and has derived from it an income of from three hundred to five hundred dollars a month. Counsel for the guardian ad litem made much of the fact that Swanson was always unsuccessful and that his various deals never resulted in much profit. Such testimony must be viewed in the light of the fact that Swanson was a promoter. He never made very much out of any one deal but he always managed to trade himself in and out of them in such a way as to make a small profit. Of course, the ordinary individual regards the plans of a promoter as fantastic. All promoters' plans are fantastic. The attitude toward promoters is peculiar. If they fail, they are called visionary and improvident. If they succeed and get rich, then they are called men of vision and foresight. The pattern of Swanson's life is no different from that of the ordinary unsuccessful promoter. During the trial, I permitted a two hour examination of Swanson by all counsel. He was subjected to the most rugged examination and cross examination. He had a reasonable, logical explanation for everything that he had done; his demeanor on the stand was that of a normal individual. Rarely have I seen a witness who conducted himself more satisfactorily than did Swanson.

I have no doubt that Dr. Hodgson's diagnosis at the conclusion of the hospital treatment was correct. Swanson suffered from toxic psychosis. Concerning this mental disturbance, Strecker and Ebauch, in their work "Clinical Psychiatry," 3d ed., p. 159, have this to say: "The mental reactions are usually those of an acute delirium with characteristic behavior disorders on the basis of apprehension, hallucinosis, and clouding of the sensorium. In this respect they may be referred to as acute organic reactions, in that the mental findings are usually transient." Further, on p. 163, these authorities say: "Prognosis. In general, the prognosis of the toxic psychoses is very good and recovery is the rule. The mortality should be small, particularly, if the essential element treatment is given and the patients are admitted promptly to Psychopathic Hospitals. The duration of the psychoses is usually brief, particularly, in acute delirium." Toxic psychosis is not a general insanity. The etiology in toxic psychosis is usually on the basis of alcoholism, morphine, lead, infections of various types, and delirious states associated with somatic diseases, particularly the acute infectious diseases. Any rule of law as to the presumption of the continuation of general insanity cannot include a condition of toxic psychosis. If it did, such a presumption would be contrary to all known scientific evidence. It is apparent to me that Swanson suffered from this psychosis temporarily and that his history since shows nothing more serious than that.

The first medical testimony was that presented by the deposition of Dr. E. R. Hodgson. The deposition was taken August 23, 1944, in Rapid City, South Dakota, where Dr. Hodgson is serving as a neurologist and psychiatrist in the Army. Dr. Hodgson had not seen Mr. Swanson between the time he discharged him from the hospital and the time of the taking of the deposition. He was shown the hospital record, the letters that Swanson wrote at that time and

immediately thereafter. There was then propounded to him a hypothetical question in which all facts unfavorable to Mr. Swanson's mental condition were included. On the basis of these, he gave as his opinion that Swanson was suffering from manic-depressive psychosis which continued into 1942. There are three reasons why I cannot accept Dr. Hodgson's conclusions.

First, because the hypothetical question was woefully inadequate. The Doctor was not told of the correspondence Swanson had with his attorney in December, 1941. He was not told that in the spring of 1942, Swanson conducted negotiations for the sale of his equity of redemption with the Cement Company. He was not told that from February, 1942, to date Swanson has retained successfully a position from which he receives a fairly adequate income. It is hypothetical questions such as this which led Judge Learned Hand, in the New York Bar Association's "Lectures on Legal Topics," 1921–1922, to say: "May I also, in passing, hold up to you a prize of great value the abolition of the hypothetical question—the most horrific and grotesque wen upon the fair face of justice * * *. (For a complete discussion of the inadequacy of the use of hypothetical questions as a foundation for expert testimony in mental cases, see "Law and Contemporary Problems: Expert Testimony," pp. 454, 459, Harold S. Hulbert.)

Second, Dr. Hodgson did not have sufficient facts upon which to base a manic-depressive diagnosis. Strecker and Ebauch pointed out ("Clinical Psychiatry", p. 228): "The role played by the exigencies of life, destructive influences traceable to environment in a broad sense, whether they be psychogenic, organic or admixtures of these factors, is too striking to be ignored. They need to be studied, evaluated and handled not only in the hypothetical normal individual, but particularly in the one who by reason of constitutional weakness is liable to develop an emotional breakdown. Such detrimental factors seldom appear as single, dramatic incidents but are usually accumulative and long existing strains. *Therefore, casual inquiry will usually be fruitless."* (Emphasis mine.) The same idea is expressed by Henderson and Gillespie in "A Text Book of Psychiatry," p. 120 (Oxford Medical Publications) when they say: "From the purely mental side, Meyer, Hoch, Kirby and Bleuler, have pointed out that the mental make-up which frequently characterizes the individual in whom a manic-depressive psychosis occurs *deserves close study."* (Emphasis mine.) Furthermore, as is pointed out by both Henderson and Gillespie, in "A Text-Book of Psychiatry", p. 119, and Strecker and Ebauch in "Clinical Psychiatry," p. 228, *hereditary predisposition* is the most important predisposing etiological factor in manic-depressive cases. There is nothing to indicate that Dr. Hodgson had any information concerning this factor in Swanson's case.

Third, Swanson evidences no clinical symptoms of manic-depressive psychosis. Doctors Grinker and Levy, in a late treatise found in "Practice of Medicine," Tice Consultive Service, v. 3, p. 758, have this to say concerning manic-depressive psychosis: "The fundamental symptoms are depression of mood, slowing and retardation of speech and motor activity and difficulties of thinking and concentration. * * * Under the influence of this mood, the individual loses interest in work and in most activities he formerly enjoyed. * * * Accompanying loss of desire and interest, there is frequently a disinterest to continue living." This is certainly far from the description of Swanson. Particularly is this true when it is remembered that after his wife died in the fall of 1942, Swanson remarried in less than two months.

The term manic-depressive was introduced by Kraepelin to characterize disorders of affect consisting either of elation or depression—disorders which previously had been termed mania and melancholia in the belief that they were quite separate diseases. This type of insanity is not common among older people. *"Being usually hereditary in its origin, it is apt to be manifest before the twenty-fifth year."* (Emphasis mine.) "Clinical Psychiatry," Strecker and Ebauch, p. 229.

The other medical testimony was submitted by Dr. Howells. Dr. Howells is an estimable old doctor who, unfortunately, has had very little psychiatric experience since he left his position as Superintendent of the Eastern Washington Hospital for the Insane in 1904. He made an examination of Swanson a week before the trial and testified that Swanson was suffering from paresis. While he was on the stand, I called his attention to the fact that the spinal puncture had shown no evidence of syphilis. He stated that he still believed Swanson was a paretic and I suggested that he re-examine Swanson, subjecting

him to some of the recognized tests. The Doctor returned in the afternoon, after the reexamination and testified that all of the tests that he had taken were negative. The Argyll-Robertson pupil was absent, the Romberg was negative. Other reflexes were normal. But the Doctor still insisted Swanson was paretic. I cannot accept this testimony. The authorities recognize that the spinal fluid test is almost conclusive. Wechsler, in his "A Text-Book of Clinical Neurology," p. 477, says: "The blood and, especially, spinal fluid Wassermann *are positive in practically 100 per cent. of cases*. (Emphasis mine.) Strecker and Ebauch say: "If the physician has clearly in mind the relative value of the signs and symptoms, the diagnosis of paresis is not difficult. In the large majority of instances the serological examination alone is conclusive. The *blood and spinal fluid are strongly positive for Wassermann in all antigens * * * ."* "Clinical Psychiatry," p. 64. (Emphasis mine.) They go on to say that the neurological findings are scarcely less characteristic: the pupils are unequal, irregular or Argyll-Robertson; tendon reflexes are exaggerated; speech is slurring. There is a positive Romberg and a shuffling slouchy gait. Wechsler confirms this opinion. He says: "Next to tabes, the Argyll-Robertson pupil occurs mainly in paresis. A little less than half the number of patients show the A–R very early in the course of the illness; *later on, nearly all paretics show reflex pupillary anomalies. * * * * The paretic speech is very characteristic. It is tremulous, dysarthric, 'slobbery.' There is slurring and elision of letters and syllables. * * * If the spinal cord changes are marked, and the posterior columns are also affected, the clinical syndrome becomes one of tabo-paresis, and *then one finds absent knee- or ankle- jerks, the Romberg sign, and bladder disturbances."* (Emphasis mine.) Furthermore, had Swanson suffered from paresis in 1941, it is beyond belief that he would be alive today. He received no treatments for paresis. Concerning the prognosis, Strecker and Ebauch have this to say: "The outlook is unfavorable and in untreated cases the majority of patients die within two years." "Clinical Psychiatry," p. 66. Wechsler says: "The *prognosis* is very grave. * * * Until recently the disease was considered fatal in practically 100 per cent. of cases. It is always fatal in the advanced stages. Patients who recovered on treatment probably had diffuse

cerebral syphilis rather than paresis. *The average duration of the disease is two to three years,* though extension over five and up to ten years is not rare." "Text-Book of Clinical Neurology," p. 478. (Emphasis mine.)

It may be that I have dwelt at too great length upon this question, the determination of which is not necessary to this case. However, Swanson never agreed to the insanity contention. He indicated very plainly during the trial that he would prefer to lose his law suit than to have a finding of insanity. In view of this situation, I have felt that it would be less than fair for me merely to make a finding upon that question and not attempt to demonstrate the correctness of that finding.

■■ This leaves for consideration the controversy between the Cement Company and Parnell. The Cement Company's claim to this mortgage lien stems from its purchase from Bennett. It is undeniable that Bennett occupied a fiduciary relationship towards Parnell. As Judge Sanborn said, in Trice v. Comstock, 8 Cir., 121 F. 620, 622, 61 L.R.A. 176: "For reasons of public policy, founded in a profound knowledge of the human intellect and of the motives that inspire the actions of men, the law peremptorily forbids every one who, in a fiduciary relation, has acquired information concerning or interest in the business or property of his correlate from using that knowledge or interest to prevent the latter from accomplishing the purpose of the relation. * * * And, within the prohibition of this rule of law, every relation in which the duty of fidelity to each other is imposed upon the parties by the established rules of law is a relation of trust and confidence. The relation of trustee and cestui que trust, principal and agent, client and attorney, employer and employé, who through the employment gains either an interest in or a knowledge of the property or business of his master, are striking and familiar illustrations of the relation." Bennett came here as Parnell's agent. He had an agreement under which he was to share equally with Parnell in the proceeds of the mortgage. His duty towards Parnell was stated by Mr. Chief Justice Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1, as follows: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the

morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Bennett, unquestionably, was faithless to that trust. His letters to Parnell show a continuous course of conduct violative to these standards. When he secured from Parnell the assignment of the certificate of sale, he withheld from Parnell information concerning his option to the Cement Company and the amount involved. He also withheld information concerning the situation with reference to the possible value of the dolomite deposit. It is true that he told Parnell he was negotiating with the Cement Company for the sale of a "lime or dolomite deposit." He did not tell Parnell that he had a $10,000 option on which he had already received $2,000. I am convinced that Parnell never knew of the possibilities of this property until after I appointed an attorney for him and the information was conveyed. It is important to remember that Parnell, in April, 1942, expected momentarily to be sent overseas. Knowing as we do the natural disposition of men in that situation to think lightly of their personal business problems, Bennett owed Parnell a higher duty for full revelation than would ordinarily exist.

A high duty to reveal the dolomite situation existed because of the peculiar dolomite development at that time. Assuming that Parnell knew that the land did contain a dolomite deposit, he had no reason to believe that it was valuable. Dolomite is a calcium-magnesium carbonate. Its primary uses prior to 1941 were for refractory purposes in the production of basic open-hearth steel and in making bisulphite acid for cooking wood pulp. The market for the latter purpose has always been too small to justify extensive development of dolomite properties in the Pacific Northwest. According to the Minerals Year Book of the Department of the Interior, (1938, p. 1048—1940, p. 1186), the total United States shipment of dolomite to paper mills during the years 1936 to 1939 inclusive was

1936  40,000 tons        1938  42,000 tons
1937  43,000 tons        1939  41,000 tons

The 1936 report of the Washington State Division of Geology included this statement: "The demand for dolomite in this state has never been large. * * * The rock is calcined in kilns on the property and as much as 500 tons per month has been shipped to paper mills at Camas, Washington, and Oregon City, Oregon." The cost of shipping dolomite from Washington to the steel mills in Pennsylvania is prohibitive. For example, in December, 1942, the United States Bureau of Mines issued a circular entitled "Dolomite—Basic Refractories" urging the development of dolomite as a substitute for magnesite for refractory purposes. It pointed out that the freight rate alone on domestic magnesite from Washington and California to Pittsburg was $14.40 per short ton, which was equivalent to 58 to 65 per cent. of the sales price f. o. b. shipping points. It pointed out that there were large dolomite deposits in Ohio, Michigan and Wisconsin much closer to the market than the magnesite areas of the West and ends with this conclusion: "It is believed that developments in the manufacture of basic refractories from dolomite which have been described previously in this · circular foreshadow an arrangement in which it will no longer be necessary to transport refractory magnesite over great distances to important consuming areas."

So that, if Parnell did know anything about dolomite, whatever he knew would have been unfavorable. The use of dolomite in the production of magnesium came distinctly as a war industry and knowledge of it was not widespread. Bennett knew these facts. In the spring of 1942, he told the witness Janni he expected to make a hundred dollars a day out of the dolomite deposit. He told the witness Allison that he expected to sell the dolomite at 10¢ per ton. Having that information, it was his duty to transmit it to Parnell and, because of his failure to transmit it, a constructive trust must be established as to one-half of the interest in the mortgage which he secured through Parnell's assignment of April 30, 1942. "Failure by fiduciary to make disclosure. A fiduciary in dealing with the beneficiary on his own account as to matters within the scope of the fiduciary relation is under a duty not only to disclose the fact that he is dealing on his own account but also to disclose all other facts which are material to the transaction. He must disclose not only the facts he knows but facts which from his fiduciary position he ought to know." Restatement of the Law, Restitution, p. 784. "If one ignores or violates this prohibition, the law charges the interest or the property which he acquires in this way with a trust for the benefit of the other party to the relation." Trice v. Comstock, 8 Cir., 121 F. 620, 622, 61 L.R.A. 176.

The Cement Company took this certificate of sale subject to this constructive trust. "A constructive trust may be defined as a device used by chancery to compel one who unfairly holds money or property to convey such money or property to another to whom it justly belongs. When a court of equity finds a defendant is holding money or property which it acquired by unjust, unconscionable or unlawful means, it will raise a trust and take such interest from the defendant and vest it in the wronged party." Grand Trunk Western R. Co. v. Chicago & W. I. R. Co., 7 Cir., 131 F.2d 215, 219. "It is a well established principle of equity that a third party who pays money to a fiduciary for the benefit of the beneficiary, with knowledge that the fiduciary intends to misappropriate the money or otherwise be false to his trust, is a participant in the breach of trust and liable therefor to the beneficiary." Seminole Nation v. United States, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480. "It seems soundly settled that one who knowingly joins a fiduciary in purchasing for profit the property of the trust estate in unlawful circumstances becomes jointly and severally liable with him for resultant profits." In Re Van Sweringen Co., 6 Cir., 119 F.2d 231, 234. Justice Taft, in Jonathan Mills Mfg. Co. v. Whitehurst, 6 Cir., 72 F. 496, 502, said: "It is well established that one who has reason to believe that another is offering property for sale, which he holds either as trustee or agent for a third person, cannot become a bona fide purchaser of the property for value by reliance on the statements of the suspected trustee or agent, either as to his authority, or as to his beneficial ownership of the thing sold. In such a case, inquiry must be made of some one other than the agent or trustee,—of some one who will have a motive to tell the truth, in the interest of the cestui que trust or principal." "Where a fiduciary in violation of his duty to the beneficiary * * * causes property to be transferred to a third person, the third person, * * * if he had notice of the violation of the duty, holds the property upon a constructive trust for the beneficiary." Restatement of the Law: Restitution, § 201(1). See, also, Humble Oil & Refining Co. v. Campbell, 5 Cir., 69 F.2d 667; Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418; Duncan v. Jaudon, 15 Wall. 165, 21 L.Ed. 142; Manhattan Bank v. Walker, 130 U.S. 267, 9 S.Ct. 519, 32 L.Ed. 959; Bogert, Trusts and Trustees, vol. 4, §§ 901, 955; Scott, Trusts, vol. 3, § 321.1.

The Cement Company knew that Bennett was the agent or partner of Parnell. It knew of the information Bennett had acquired. It knew that Parnell was in the military service about to go overseas. It advanced the money to Bennett to go back to secure the assignment from Parnell. For some peculiar reason which witnesses for the Cement Company could not explain satisfactorily, it advanced thousands of dollars to Bennett months before such money became due on the option. It knew the kind of a life Bennett was leading here and that the money that it was paying to Bennett was not being turned over to Parnell. This is demonstrated by the fact that it took Bennett's personal notes for all these advances and the witness Bell's explanation of how the advances came to be made. The last payments were for Bennett's hospital bills and to his estate. It was only when this last payment was made that the Cement Company acquired title to the partial assignment of the Certificate of Sale. No explanation was given of Bennett's suicide but, that in itself, should have influenced the Cement Company towards reaching a conclusion that it had some responsibility to the man whom Bennett represented. It must be remembered that, by that time, the Cement Company had reached its present conclusion that to it, over a long term, the property was worth at least $500,000. By that time, also, it knew from Parnell's letters that he had no realization of the potential value of this property.

It is argued that Parnell ratified this transaction. It is true that he later learned that Bennett had received $10,000 and did not file a claim for half of it with the Bennett estate. That, however, did not amount to ratification of the transaction with the Cement Company. This for the reason that he did not have knowledge of all the material facts. "To establish a ratification of a cestui que trust, the fact must not only be clearly proved, but it must be shown that the ratification was made with a full knowledge of all the material particulars and circumstances and, also * * * that the cestui que trust was fully apprised of the effect of the acts ratified, and of his and her legal rights in the matter." Fidelity Trust Co. v. Butler, Ky., 91 S.W. 676, 681. See, also, Findlay v. Hildenbrand, 17 Idaho 403, 105 P. 790, 29 L.R.A., N.S. 400; Miller v. Ahrens, 4 Cir., 163 F.

680

870, 877; Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 130 F.2d 1016, 1022; Ferro Concrete Const. Co. v. United States, 1 Cir., 112 F.2d 488, 491; Buss v. Prudential Ins. Co., 8 Cir., 126 F.2d 960, 965. The Cement Company took this assignment with the trust impressed upon it. It, therefore, acquired only Bennett's one-half interest in the lien of the mortgage judgment. Parnell owns the other one-half.

Tract 4 was not involved in the assignment to the Cement Company. Therefore, it will stand in the same position as tract 3 except that one-half interest is owned by the Bennett Estate. Whatever is awarded for this tract will first be subject to the mortgage lien owned equally by Parnell and the Bennett estate and any balance will go to the defendants Swanson.